## FANNIE EPPSTEIN v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

### In Banc, June 20, 1906.

1. **NEGLIGENCE: Contributory: Perilous Position: Seen or Unseen: Ordinary Care.** Where a pedestrian *sui juris*, unconscious of his peril, has negligently placed himself in a position of danger so far away from the danger that his death may be averted by the use of ordinary care by those who see him and who use the dangerous instrumentality, his death is actionable. And if, under this hypothesis, the person so exposing himself to danger (for example, the danger from a railroad train approaching from behind) is at a place where those controlling the dangerous instrumentality have no reason to expect a clear track, but have reason to expect the presence of people, then it makes no difference whether such person is seen or not, if to look is to see, and if thereafter by the use of ordinary care the danger may be averted. And tested by that rule the facts of this case authorized a recovery.

2. ———: ———: ———: ———: ———: **Implied Invitation to Use Railroad Track: Question for Jury.** Where the use by the public of a railroad track as a foot-path was such that it becomes a mixed question of law and fact whether those operating a train thereon had reason to anticipate the presence of people there, that issue should be submitted to the jury as a fact to be determined by it.

3. ———: ———: ———: ———: ———: **Notice of Use: How Proved.** Knowledge or notice of the user by the public may be proved by the existence of paths well worn by human feet, and by gaps in the fences, stiles and gates appurtenant to such path, by the long-continued going to and fro of people more or less constantly, and by the presence of schools, places of recreation, and the use of the track by visiting pedestrians and habitues.

4. ———: **Ordinary Care: Preoccupied Pedestrian on Track: No Warning.** An aged pedestrian stood, in a preoccupied attitude, on defendant's railroad track, which had long been used as a footpath, his back to the approaching train, looking at a heavy train passing on a parallel track ten feet away, oblivious to the approach of defendant's train behind him, and could not have heard the noise of defendant's light train because of the noise of the other. *Held*, that defendant's servants, in not ringing the bell or sounding the whistle, as the ordinance required, did not perform the ordinary care which the law requires in such cases.

5. ———: **Instruction: Omission of Concurrent Act.** Where the case and the instructions proceeded on the theory that the deceased was negligent in placing himself in a position of danger, and that thereafter, being oblivious of his danger, the continuing danger of defendant, which might have been avoided by ordinary care, caused his injury, an instruction, which at bottom embodies the humanitarian doctrine, is not error for that it ignored the deceased's alleged concurrent act of negligence.

6. **REMARKS OF COUNSEL: Appellate Practice.** Attorneys in their argument to the jury should not discuss the significance of refused instructions. But where no exception was saved to the ruling of the court on objection made to such remarks, and they were not made a ground of the motion for new trial, they cannot be considered on appeal.

Appeal from Cooper Circuit Court.—*Hon. Jas. E. Hazell,* Judge.

AFFIRMED.

*Martin L. Clardy* and *John Cashman* for appellant.

(1)  The court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence at the close of plaintiff's case.  (a)  The evidence offered by plaintiff proved beyond a doubt that deceased was a trespasser.  With this, there is a total failure of any proof that the persons in charge of defendant's train saw the deceased upon the track in time to have stopped the train before it struck him.  Indeed, the evidence proves that no person on the train saw deceased at all.  In this state of the evidence there was nothing to submit to the jury.  Carr v. Railroad, 195 Mo. 214; Baker v. Railroad, 98 Mo. 50; Carrier v. Railroad, 175 Mo. 470; Van Bach v. Railroad, 171 Mo. 338; Engleking v. Railroad, 187 Mo. 158; Koegel v. Railroad, 181 Mo. 379; Coatney v. Railroad, 151 Mo. 35; Moore v. Railroad 176 Mo. 528; Loring v. Railroad, 128 Mo. 349; Tanner v. Railroad, 161 Mo. 497.  (b)  Even if it

197 Sup.—46

be conceded that deceased was, as contended by plaintiff, a licensee, still plaintiff cannot recover, because all the evidence is that deceased was upon defendant's track for his own convenience and pleasure, and this alone. In this state of facts defendant owed deceased no duty to keep a lookout for him, by those in charge of the train. Carr v. Railroad, supra; Moore v. Railroad, 84 Mo. 485; Straub v. Soberer, 53 Mo. 43; Barney v. Railroad, 126 Mo. 389; Morgan v. Railroad, 7 Fed. 79; Wencker v. Railroad, 169 Mo. 592; Sweeney v. Railroad, 10 Allen 372; Cusick v. Adams, 115 N. Y. 55; Elliott on Railroads, sec. 1250. (c) Plaintiff's evidence discloses a case of such inexcusable abandonment by deceased of any care for his own safety, and such a reckless disregard of that watchfulness and precaution which the law demanded of him in the position in which he placed himself, that he cannot, in any event, recover in this case, especially where, as here, there is an absolute absence of any proof that those in charge of the train ever saw deceased before he was struck, or of any reckless, willful or wanton disregard of human life by the persons in charge of the train. Davies v. Railroad, 159 Mo. 1; Tanner v. Railroad, 161 Mo. 497; Carrier v. Railroad, 175 Mo. 470; Engleking v. Railroad, 187 Mo. 158; Coatney v. Railroad, 151 Mo. 35; Guyer v. Railroad, 174 Mo. 344; Koegel v. Railroad, 181 Mo. 379; Holwerson v. Railroad, 157 Mo. 216; Van Bach v. Railroad 171 Mo. 338; Peterson v. Railroad, 156 Mo. 552; Sharp v. Railroad, 161 Mo. 214; Culbertson v. Railroad, 140 Mo. 35; Vogg v. Railroad, 138 Mo. 172; Watson v. Railroad, 133 Mo. 246; Maxey v. Railroad, 113 Mo. 1; Powell v. Railroad, 75 Mo. 80. (d) The law presumes that the engineer or the persons in charge of the train discharged their duty, and in the absence of all evidence to the contrary, this presumption is the law of the case, as so often declared by this court. Buch v. White, 85 Mo. 356; Long v. Company, 68 Mo. 431; Hammond v. Gordon, 93 Mo. 226; State ex rel. v.

Bank, 120 Mo. 169; Lenox v. Harrison, 88 Mo. 491; State ex rel. v. Williams, 99 Mo. 302; Mathias v. O'Neal, 94 Mo. 528; Yarnell v. Railroad, 113 Mo. 579; Henry v. Dulle, 74 Mo. 451. (e) Even if it be conceded that those in charge of the train did actually see deceased upon the track, they had a right to presume that he would exercise usual and ordinary precautions of a person who voluntarily places himself in a position where he is liable to be overtaken by engines or trains at any time. This presumption may be indulged by the trainmen until the actions or attitude of deceased assume a course or state which indicates to a person, in the exercise of ordinary judgment, that deceased was wholly oblivious of his peril. If, after the trainmen became aware that deceased was unmindful of his dangerous situation, they acted promptly and used the means at their command to avoid injury, in a way consistent with the safty of those in their charge, defendant cannot be held liable. Carrier v. Railroad, 175 Mo. 470; Guyer v. Railroad, 174 Mo. 344; Engleking v. Railroad, 187 Mo. 158; Boyd v. Railroad, 105 Mo. 371; Van Bach v. Railroad 171 Mo. 338; Coatney v. Railroad, 151 Mo. 35; Barker v. Railroad, 98 Mo. 50. (2) The failure to ring the bell, or give the signal, is not shown to have contributed to the injury, nor did the speed of the train contribute to the injury. It is then immatial whether defendant failed to perform either of these duties. The acts and conduct of deceased being grossly negligent, and this negligence continuing up to the moment of the accident, concurred with any negligence of which defendant's servants may be guilty, and, therefore, precludes a recovery in this case. Koegel v. Railroad, 181 Mo. 379; Peterson v. Railroad, 156 Mo. 552; Green v. Railroad, 90 S. W. 805; Schmidt v. Railroad, 90 S. W. 138; Maxey v. Railroad, 113 Mo. 1; Powell v. Railroad, 76 Mo. 80. (3) From the failure of defendant to introduce the engineer and fireman, or other members of the train crew to testify at

the trial, there can be no legal presumption raised against defendant as to the conduct of the men in charge of the train. The rule is that where a particular person is equally within the control of both parties and is not called as a witness, there is no ground for any presumption against either. Kerstner v. Vorweg, 130 Mo. 201; Bank v. Worthington, 145 Mo. 103.

*W. G. & G. T. Pendleton* and *W. M. Williams* for respondent.

(1) The testimony amply justified the court in submitting the case to the jury, and the verdict is fully supported by the evidence. Pedestrians, citizens of Boonville and farmers living in the vicinity had for many years, without objection on the part of defendant's servants and agent, used the railroad track at the place where deceased was hurt, and north and south thereof, as a pathway in going to and returning from the business part of the city. This had continued so long that defendant's servants in charge of its trains must be held to have had notice thereof. The custom must have been known to the defendant, for, in addition to the general use of the track for this purpose, which had existed for years, it posted signs immediately after the injury, warning people not to go on the right of way. The engineer in charge of defendant's locomotive had "reasonable ground to expect or anticipate the presence of persons" on the track about that place, and it was his duty to keep a look-out for the presence of such persons thereon. Fearons v. Railroad, 180 Mo. 222; Rayburn v. Railroad, 187 Mo. 573; Morgan v. Railroad, 159 Mo. 262; Murrell v. Railroad, 105 Mo. App. 93; Gunther v. Railroad, 95 Mo. 286. "It has been repeatedly held by this court that greater care is to be exercised by persons managing a train of cars within the limits of a town or city than is required in the country. In towns caution should always be used." Frick v. Railroad, 75

Mo. 609. (2) Defendant's servants in charge of its train, with the slightest care upon their part, and by merely looking ahead of them, could have seen deceased for at least three hundred yards before he was struck, and in view of the dangerous machinery which they were handling, and the long-continued practice of people to walk on said track, they should have been on the look-out; and had they looked they would have seen that the attention of the deceased was drawn to the Missouri, Kansas & Texas freight train coming from the south on a track parallel with their own, and that he was looking at said freight train with his hand shading his eyes, and was oblivious of the approach of defendant's train from the north, and that some warning or signal was necessary in his perilous situation. Defendant's servants wholly failed to sound the whistle, ring the bell or give him any warning whatever, and in this there was culpable negligence. Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 222; Thomas v. Railroad, 39 L. R. A. 399; Pickett v. Railroad, 30 L. R. A. 257. (3) The ordinance of the city of Boonville read in evidence required the bell to be rung contantly while the locomotive was passing through the city. This was not done nor was any other signal or warning given to deceased before the train struck him. The failure to ring the bell, as required by the ordinance, was negligence *per se.* Eswin v. Railroad, 96 Mo. 290; Keim v. Railroad, 90 Mo. 314; Burger v. Railroad, 112 Mo. 238.

LAMM, J.—This is a suit by the widow of Veit Eppstein to recover statutory damages for the death of her said husband through the alleged negligence of defendant railroad company. To reverse a judgment in her favor, defendant appeals.

The petition counts on the following grounds of recovery:

First: That Mr. V. Eppstein was killed on defend-

ant's track in the city of Boonville, where at the time there was an ordinance in force providing that no engine or car should be run at a greater rate of speed than five miles per hour and that the bell of each locomotive should be rung continuously while such engine is passing through the city—one of the complaints being that defendant negligently violated this ordinance and by such violation caused his death.

Second: (to borrow the language of the petition): "Plaintiff . . . states that on the 7th day of March, 1902, the plaintiff's said husband, Veit Eppstein, was walking southward on the track of said defendant's railway about one half mile south of defendant's station in said city of Boonville, and within the limits of said city, and where the track was level and straight for a long distance and which for many years pedestrians had been accustomed to use as a road and foot path by the forbearance and tacit consent of defendant. That at the time and place aforesaid, and while deceased was so walking on defendant's said railway track, he was run against and struck by a locomotive attached to a train of cars, belonging to the defendant, and which approached him from the rear, whilst the same was being run, conducted and managed by the agents and servants of the defendant, and by reason of being so struck and run against was bruised and wounded and from the effects thereof died. That the injury resulted [sic] in the death of plaintiff's said husband as aforesaid, was, occasioned by the negligence and unskillfulness of the defendant's said servants and agents in operating said locomotive and train of cars in this, to-wit: That said servants and agents saw or by the exercise of reasonable diligence could have seen, in time to avert said injury, the dangerous position in which plaintiff's deceased husband was situated, and seeing, or being, by the exercise of reasonable care and diligence, enabled to see the imminent peril in which her said husband was placed, and that the de-

ceased was unaware of the near and dangerous approach of said locomotive and train of cars, negligently failed to sound the usual and ordinary signal in time to avert the said injury, and did not at any time before the injury to her said husband, either ring the bell, sound the whistle or give any other signal by which her said husband might be warned of the near and dangerous approach of said locomotive and train of cars, and negligently and carelessly failed to use the air-brakes or other appliances provided for stopping said train, and negligently failed to use the appliances provided and at hand for putting said train under control and stopping same before it struck her said husband, but on the contrary thereof, recklessly, negligently, willfully and wantonly ran its said locomotive and train against the plaintiff's said husband, as aforesaid.''

The answer pleads the general issue, contributory negligence, and that Eppstein was a trespasser.

The reply put in issue the new matter in defendant's answer.

At a jury trial defendant, introducing no evidence, stood on plaintiff's case. Its demurrer to plaintiff's evidence being overruled, it saved an exception. Objections were made and exceptions saved to the giving of certain instructions for plaintiff, and to the refusal of certain instructions asked by defendant. Contentions are pressed here by appellant relating to the giving and refusal of instructions and relating to certain remarks made *arguendo* by counsel for respondent to the jury. But no error relating to the admission of evidence is assigned in appellant's brief. One such suggestion is made in appellant's statement, whereby the deposition of one Isenberg is challenged. Of this suggestion, it may be said that it is true the introduction of this testimony was objected to, but no exception was saved to the ruling of the court, *nisi,* and hence the matter is apparently abandoned as a ground of reversal.

Appellant's main insistence is that there was re-

versible error in refusing to give its instruction in the nature of a demurrer to the evidence, and this insistence seeks the facts. Attending, then, to the facts, the case made is this: Mr. Eppstein was upwards of seventy-four years of age. His eyesight was good, such, for example, as might be inferred from the fact that, while he wore glasses to read, he could see the time shown by his watch without putting them on. He was as active as an average man of fifty. In full daylight, between 8 and 10 o'clock of the morning of March 7, 1902, a day described by one witness as a cold, winter day, Mr. Eppstein was walking south within the city limits of Boonville, and midway between the rails of a straight portion of appellant's track leading from Boonville to Tipton. There is an upgrade there to the south. He had about his neck and shoulders a shawl he was accustomed to wear, though there is no evidence it muffled his ears or in any wise interfered with his hearing, and the quality of his hearing was such that his family had no need to repeat questions or observations in order to elicit his attention or make him understand. In short, his hearing may be conceded prime for one of his years. At that precise time there was approaching him in the rear, running south at from 8 to 10 miles an hour, a light passenger train of appellant's, consisting of two coaches, a baggage car, tender and locomotive. Whether this train was running on a regular scheduled time, or whether off time does not appear. Neither does it appear whether Mr. Eppstein knew of the schedule time, if any. In this condition of things and under these circumstances, without ringing its bell or giving any other warning, the locomotive ran him down and inflicted mortal wounds upon his skull, legs and body, so crushing him as to render him unconscious, from the resulting shock of which wounds and consequent waste of blood he presently died without regaining his senses. That he was seen by appellant's train crew is inferable from

the fact that the train stopped quickly—so quickly that the rear coach did not pass his body, and thereupon they took him on board and backed half a mile or so to appellant's station. But there is no evidence they saw him *before* they ran him down, other than might be inferred from the fact that he was in their plain eyesight for, say, 300 yards before the engine struck him, provided, of course, such servants were in position and on the look-out.

Uncovering, at this point, further details of the environment and accident, it appears that parallel with appellant's track and about ten feet away, for a mile or more at the *locus in quo,* is the main track of the M., K. & T. railroad, somewhat elevated and built up, by a fill and rock ballast, higher than appellant's track. At that immediate time, on said M., K. & T. track, there was, running down grade and north towards Boonville, an M., K. & T. freight train of thirty-five cars. It was going slow, say, six, or seven miles an hour, but making a good deal of noise. As this train on the M., K. & T. track approached Mr. Eppstein, standing on the Missouri Pacific track, he stopped, raised his right arm, put his right hand shield-like above his eyes and from thence forward he gazed attentively and in an attitude of fixed and absorbing interest at the M., K. & T. train for some little while, first as it approached and then as it was passing him. His face and vision were towards the south, and, standing in that rigid and absorbed attitude, with his arm so raised and his hand so employed, appellant's train, as said, slipped on the old man from behind and killed him unannounced.

There is not an iota of evidence that he at any time was conscious of the approaching train at his rear or of the imminence of his danger. The petition and the evidence present a case in which decedent put himself voluntarily in a place of peril and, by his act

of so putting himself in such peril, was guilty of negligence.

The turning and controlling issue in the case we now approach, and that issue is, assuming Mr. Eppstein's negligence in so locating himself, was the place of such character that appellant company had reason to anticipate the presence of persons on the track and thus did it come to owe them a duty to look, to see and to warn? On this score the evidence, without detailing it witness by witness, tended to show the following further facts:

Somewhat north of the place and adjacent to the track are the grounds of a cadet academy, the Kemper School. On the grounds of Kemper School is an athletic field where athletic training is in progress during springs and autumns, and where athletic games are played. Somewhat south of the place and adjacent to the track, still in the city limits, are the fair grounds where, at least up to a year or so prior to the accident, fairs were held. At the corner of these grounds, next to the track and closest to the business portions of the town, is a gap in the fair grounds fence. This fence is of wire and some of its intermediate strands have either been cut out or else they have been elevated and nailed to a post, as we interpret the evidence, so as to permit ingress to and egress from said fair grounds by pedestrians. One of the witnesses described this gap in this way: "The wires is nailed up in the fence with a post in there to hold the wires up and there is a gap where everybody passes through there." One witness suggested there had been a gate there, but the suggestion is put into the record more as a guess than otherwise. It is not shown who put these wires in that condition or who made the gap, but the evidence indicates that the wires were in such manifest fixed position so long as three or four years and likely more. Leading into the fair grounds, through this gap, from appellant's railroad track is a well-worn foot-path, referred

to by some of the witnesses as a "big path." The testimony is conclusive that the path was worn by footmen and the broad fact is inferable that it was made by pedestrians using the track of appellant from the business portions of Boonville to the said corner of the fair grounds, where they diverged and went into the fair grounds, or elsewhere. But the record does not leave the fact alone to inference, because it was shown that, when the fair grounds were in use at any time, many people (estimated at hundreds daily) used appellant's track and said path to go to said grounds. It was shown, furthermore, that a similar use was made of the track from the business portion of the city by those interested in athletic events occurring on the Kemper School grounds. This part of the record is summarized by appellant in its statement, as follows: "The evidence also tends to show that during the spring time persons would walk along this track going to baseball games at the Kemper School grounds, and in the fall of the year persons would go along this track to witness football games." While indefinite in extent, and the product somewhat of inference, it may be said to be established that there was also a more or less constant use of this track for an extended time by Boonville people for purposes of recreation and pleasure, as well as for business for those who had business in that direction. Such use by these people was more pronounced in fine weather and still more pronounced on Sundays. It was shown, however, that appellant ran no regular train over its branch road to Tipton on Sundays, but did run specials now and then. On the other hand, the record is silent as to whether or not the crew of the regular week-day train ran the Sunday specials.

On top of the use heretofore indicated, there was that indefinite and sporadic use of the track by pedestrians common to all railroad tracks, maybe, when the dirt roads were wet and heavy and the railroad presented a dry pike or path. The latter use, on which

we lay no controlling stress, was confined to farmers who came to town on foot in muddy weather, and to those wandering unfortunates, designated rudely by one witness as "bums and hobos."

About a quarter of a mile west of appellant's track was a public road and about a quarter of a mile east was another. The houses in that neighborhood were built mainly along these public roads and the immediate land about the place of the accident was cut up into parcels and put to the use usual in the suburbs of old settled towns of the size of Boonville in Missouri. We gather also from the evidence that the railroad right of way was fenced and we infer that the two side fences included both the M., K. & T. and the Mo. Pac. tracks.

The record shows, furthermore, that no signs had been posted to warn the public against trespassing on appellant's track until after the deplorable death of Mr. Eppstein. If appellant at any time had taken any steps to prevent the use of its track by pedestrians as heretofore set forth, other than by posting trespass notices subsequent to the accident, such fact is not made to appear.

The ordinance, relating to the rate of speed and requiring a bell constantly to be rung on a moving locomotive in the city limits, pleaded in the petition, was put in evidence.

I. Should the case have been allowed to go to the jury at all on the showing made by this record? In other words, should appellant's demurrer have been allowed?

Based on a self-evident premise, it may, in a large way, be laid down that the sacredness, the dignity of human life is the master-key in unlocking the problems of jurisprudence—the central fact in all law, human or divine—furnishing the crowning object of civilized government and the essential purpose and need of the very existence of courts. Liberty, property and the pursuit

of happiness are the mere collateral offshoots, all, to that parent stem—the flowers blooming from that stalk. Far be from us the day when light indifference, a callousness born of the capricious needs of commerce, whereby the public conscience and sensibility may be seared as with a hot iron, allows that sacredness to be lowered or whittled away by the negligent omission of ordinary care. Controlled by that touchstone, leavened by the leaven, a great cloud of decisions of this court promulgate, *inter alia*, the following rules governing cases brought under our statutes, such as the one at bar, viz.:

(a) Where one (at least one *sui juris*) is in a place of safety and therefrom negligently moves to a place of danger, so immediately before that danger that it may not be averted by the use of ordinary care by those controlling the dangerous instrumentality, and is killed, his death is not actionable.

(b) Where one, unconscious of his peril, has negligently placed himself in a position of danger so far away from that danger that his death may be averted by the use of ordinary care by those who see him and who control the dangerous instrumentality, his death is actionable.

(c) If, under the latter hypothetical proposition, the person so exposing himself to danger is at a place where those controlling the dangerous instrumentality have no reason to anticipate the presence of people, and is killed without being seen in time to have avoided his death by the use of ordinary care, his death is not actionable.

(d) But, if, under the same hypothetical proposition, the person so exposing himself to danger (for example, danger from a going locomotive) is at a place where those controlling the dangerous instrumentality have no reason to expect a clear track but have reason to expect the presence of people, then it makes no difference whether such person is seen or not, if to look is

to see and if thereafter by the use of ordinary care the danger may be averted.

In this case it is stoutly affirmed on one side and as stoutly denied on the other that the latter principle applies to the facts. Does the principle apply? We think it does. In a given case there might be such scant or neutral evidence of public user of a portion of a track— mere sporadic instances thereof—that a court, as a matter of law, would determine that the servants of a railroad company charged with the running of a locomotive engine, had no duty to look and see. In such case, unless they did see the dangerous exposure of a person on the track, and in time to avert injuring him by the use of ordinary care, the court would take the case from the jury. On the other hand, there might well be a case where the public user of a portion of the track by pedestrians was so constant, so pronounced, so manifest and uncontradicted that there could be no two opinions about it among reasonble men, and the court, as a matter of law, might assume that locomotive operatives owed a duty to the public to be on the look-out there. Then, too, there might be a case lying between said extremes, and in our opinion this is one, where the use by the public of the track was of such sort that it became a mixed question of law and fact whether those running a locomotive engine had reason to anticipate the presence of people, and in such case that issue should be submitted to the jury, as a fact to be determined by it. Liability in each instance is predicated of knowledge or notice of the user. Such notice may be proved by the existence of paths well worn by human feet, and by gaps, stiles and gates appurtenant to such path, by the long-continued going to and fro of people more or less constantly, and by the proved presence of schools, places of recreation, etc., and the use of the track by visiting pedestrains and habitues, all of which elements are presented in this case to an extent of such significance as made the issue, in our opinion, one for

the triers of fact to decide. Confronted by the evidence indicating notice and knowledge, appellant remained silent, and in the practical administration of the law the every-day significance of that silence should not be ignored.

Assuming, then, as found by the jury, that Mr. Eppstein was killed at a place where appellant's servants had reason to anticipate the presence of people on its track, appellant is confronted with the duty of using ordinary care to see and ordinary care to prevent injuring him. How was that present and humane duty performed? It was not performed in this instance, because the ordinance requiring a bell to be rung was disobeyed. Because, moreover, appellant's servants, had they seen Mr. Eppstein, would have had no call to assume that he heard the notice of their train, or would step from the track to avoid danger. And this is so for the reason that the mere running noise of their train might well be submerged in the greater running noise of the heavy freight on the adjoining track. It is so for the further reason that his attitude, his arm, his hand, the direction of his vision would demonstrate to any reasonable man that he was quite engrossed in the passage of the M., K & T. train and oblivious to all else.

Appellant's servants with plenty of space and plenty of time to see, with no obstruction in the way of seeing, warned by his preoccupied attitude and conduct of the fact that he was oblivious to their approach, owed him, we think, the simple and easy duty to tell him they at once purposed occupying the identical spot he was on with their ponderous engine. This is not requiring anything extraordinary at their hands — a twist of the wrist would have done it presumably. Indeed, the absence of all warning signals, by whistle or bell, would indicate to us, as a charitable view, that they did not see him, but were possibly doing precisely what he was doing, namely, watching the M., K. & T. train; and the silence of appellant in this particular when confronted

by the evidence in this case pertaining to the straight track, the peculiar attitude of this venerable man at the time he was struck and before, and the other facts in proof, must be held to indicate either an inability or an indisposition to controvert respondent's array of facts.

That this case should have been allowed to go to the jury, we think is within the reasoning of many of our decisions, of which a sample must suffice, Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 208 — where the cases are reviewed, differentiated and applied. See, also, the remarks of GANTT, J., *arguendo,* in Scullin v. Railroad, 184 Mo. l. c. 705 and 707.

II.    Was the case properly put to the jury in respondent's declarations of law?

Only one of respondent's instructions is criticised and that one is this:

"The jury are instructed that it is admitted that plaintiff is the widow of Veit Eppstein, deceased, and that suit was begun within six months after his death; and if the jury believe from the evidence that said Eppstein was, on or about the 7th day of March, 1902, struck by a locomotive engine then being run on defendant's railroad by its servants and employees, and that he was thereby so injured that his death resulted therefrom; and that at the place where said Eppstein was struck, many people were at that time, and had been for several years prior thereto, accustomed to use said track as a footpath to and from points in the southern part of the city of Boonville and beyond, and that said track had been used in this way continuously for many years, and that defendant's servants and agents in charge of said train could reasonably have expected to find persons on said track at that place, on account of the frequent and continuous use thereof by footmen; and that no signal or warning was given by defendant's servants and agents in charge of its engine as it approached the deceased, and no efforts were made by them to prevent said in-

jury, and that said Eppstein was not conscious that said train was coming towards him; and if the jury shall further find that defendant's servants and agents could, by the exercise or reasonable care and diligence, have seen said Eppstein upon said track a sufficient distance ahead of said train, so that by giving such signals or warnings, or taking such other action as a reasonably prudent man would have done under the circumstances, said accident could have been avoided, but that defendant's agents and servants in charge of said train through their carelessness and negligence either failed to observe said Eppstein upon said track, or failed to give proper signals or warnings, or to take such other action as a reasonably prudent man would have done to avoid such injury; then the jury should find the issues for the plaintiff, notwithstanding they may believe from the evidence that said Eppstein was on said railroad track without legal right, and was himself guilty of negligence in being there."

The criticism leveled at this instruction, and which criticism to some extent is embodied in declarations of law asked for by appellant and refused, is that it ignored the existence of an alleged concurrent act of negligence on the part of decedent. But, in answer thereto, it must be remembered the case and the instruction proceed on the theory that decedent was negligent in placing himself in a position of danger and that thereafter, being oblivious to the danger, the continuing negligence of appellant, which might have been avoided by ordinary care, destroyed him. No rule, adjusting the relative rights of the carrier and persons on the track, may be laid down which would fit all cases. Some courts have tried to meet the difficulty with the doctrine of comparative negligences, others by the "last chance" doctrine, but all the cases recognize that though one is where he ought not to be, yet another may not negligently kill him. And that is precisely this case, and (at

197 Sup.—47

bottom) the humanitarian rule. The instruction, in our opinion, was well enough and the instructions of appellant announcing a contrary doctrine, as applying to the facts in judgment, were properly disallowed.

III. Another matter is brought to our attention which, were the record in a different form, would present a serious question indeed. Speaking for itself, the record shows as follows:

"Mr. G. W. Pendleton, of counsel for the plaintiff, in his argument to the jury, said: That it was the duty of the court to give the demurrer to the evidence if the plaintiff had no case, and in not giving the demurrer and letting the case go to the jury he decided, in effect, that the plaintiff did have a case.

"By Mr. Shirk: Now, if your Honor, please, I object to the statement and I want to except to it to the court. The court simply decided by not giving that demurrer that the question must be submitted to the jury, and that the court had no right to decide a question that should be submitted to the jury. I except to the statement and ask the court to reprimand him and withdraw it from the jury.

"The court made no ruling upon the exception."

The learned counsel was inadvertently outside the province of argument to the jury when he discussed to them the significance of a refused instruction. His remarks, therefore, should have been withdrawn and the trial court should have promptly and in no uncertain way placed this matter right by a ruling and a cautionary reproof. But appellant is in no condition here to ask relief from the incident, because it considered the matter of so little importance as to omit it from its motion for a new trial. Not only so, but the remarks of appellant's counsel, to-wit, "I except to the statement," is by context shown to be merely equivalent to saying, I object to the statement. The phrase, "The court made no ruling upon the exception," is by the same context

shown to be equivalent to, the court made no ruling upon the objection. In other words, as known to the practice, no *exception* was saved to the non-action of the court.

Because the motion for new trial treats the matter *sub silentio* and because no exception was saved to the failure of the court to rule and reprove, the matter in hand cannot be allowed as reversible error.

The cause otherwise was well tried, and, accordingly, the judgment is affirmed.

PER CURIAM: This cause having been sent to Banc on a dissent expressed in overruling a motion for rehearing, and being reheard in Banc, the foregoing divisional opinion of *Lamm, J.*, was adopted as the opinion of the Court in Banc, and, in accordance therewith, the judgment of the circuit court is affirmed. *Brace, C. J.*, *Valliant* and *Gantt, JJ.*, concurring *in toto;* *Burgess, Fox* and *Graves, JJ.*, concurring in the result.