Sarah English, Executrix of the Estate of Joseph Mulholland, v. Wabash Railway Company and August Hestler, Appellants.— 108 S. W. (2d) 51.

Division One, July 30, 1937.

*Berryman Henwood* and *Homer Hall* for appellants.

*Pross T. Cross, Gerald Cross, Louis R. Weiss* and *Mosman, Rogers, Bell & Buzard* for respondent.

HYDE, C.—This case, recently reassigned to the writer, is an action for damages for personal injuries. Plaintiff was struck by a train while walking on the Wabash tracks. Plaintiff had a verdict for $20,000, against both the Railway Company and its engineer, from which they have appealed. Plaintiff died after judgment, and the cause has been revived in the name of his executrix, but we will refer herein to plaintiff, in our statement of facts, meaning the original plaintiff.

Defendant assigns as error the overruling of its demurrer to the evidence at the close of the case. We, therefore, state the facts shown by plaintiff's evidence, and by evidence of defendants most favorable to plaintiff's contentions. On May 22, 1924, plaintiff went on a Wabash section foreman's motorcar to the town of Missouri City to get his final pay check for track work. He had been working with a Wabash section gang, but had quit two days before. After he got his check cashed, about ten A. M., he started to walk east along the track to go from the town to the place where the gang was working in order to ride back west with them to South Liberty. The next station east of Missouri City was Excelsior Springs Junction. The Wabash was double tracked between these stations. Its tracks running east from Missouri City were on the north bank of the Missouri River for about a mile. They then curved away to the northeast and in less than a half mile began to curve back toward the river. The river had undermined the tracks at its old location, and they had to be moved to the north. They curved around some farm buildings which were known as the Grubbs' farm and were located about a mile and a half east of Missouri City. Between the house and other out buildings on the south side of the railroad tracks and the public road on the north side of the tracks there was a private farm crossing. There were trees around the house, which together with the buildings, shut off the view of the tracks to the east but there was a clear view as far as the farm crossing. The railroad tracks were raised above the surrounding flat level bottom land. Plaintiff said that he walked east in the middle of the south eastbound track between the rails all the way from Missouri City to the Grubbs' farm crossing. He said that he did not hear a whistle or bell at any time but heard a rumble of the train at the time he reached the crossing and was struck by it before he crossed over the crossing. He said there was a path in the middle of this track but found as he "walked the railroad track, part of it was already cleaned out;" and that the ballast had been cleaned out between the ties, for two or three rail lengths at a place, in ten or twelve places before he reached the farm crossing. He also said: "They had taken the dirt out and put it here at the end of the ties so as they could put it back again. They hadn't put it back yet and I had to step from tie to tie."

The section men were working around the curve about 800 feet beyond the farm crossing. They were removing old cinder ballast and raising the tracks in preparation for putting on new rock ballast. Two of the section men said that they saw plaintiff walking in the middle of the track before he reached the farm crossing. One of them, Smith, said that he saw plaintiff walking east six to ten feet west of the farm crossing and about 700 or 800 feet from where he was working; that at that time he saw the train west of him about 150 to 200 feet; that he continued to look at it two or three seconds

and it continued to get closer to plaintiff; that he turned his face away and went to digging between the ties again when it was probably 100 to 125 feet behind plaintiff and did not see it strike him. Another section man, Hannah, said he saw plaintiff coming down the center of the eastbound track near Grubbs' crossing and saw the train about 200 or 300 feet west of him. He said: "We were tamping up and running off preparing to let the train by. We quit work for the train as it come on shortly after that as soon as we got our run made." Both section men said that the section foreman gave highball signals for the train to come on after it had passed the farm crossing. After the train passed the section men they found plaintiff south of the track not far from the crossing. Keith Grubbs who was twelve years old at the time of the accident said he was on the porch of the farmhouse and saw plaintiff walking between the rails on the south track. He also saw the train when it got to where a flagman was stationed about 1000 feet west of the farm crossing. He said that he had heard the train whistle for Missouri City when plaintiff was about as far west as the flagman. He also said he heard the train whistle for the flag with two blasts of the whistle, and that the train slowed down after it passed the flagman and continued on thereafter at about the same speed; he said that he could not see the farm crossing because their chicken house was between it and the house. He saw plaintiff until he got behind the chicken house and also watched the train until it passed out of his view behind the chicken house. When he did not see plaintiff east of the crossing after the train had passed he went down to investigate and found him injured and called the flagman and the section men.

Defendant engineer was put on the witness stand by plaintiff for examination under the rules of cross-examination. He said Excelsior Springs Junction was the first stop after leaving Kansas City and that he had orders to reduce speed at the mile post west of there on account of men working on the tracks. He said he was looking for the flagman and when he saw him slowed down to about fifteen or twenty miles per hour; that he released the air, shut off steam, and was drifting on down towards the point where the men were at work. He said that when he saw the flagman he gave two short blasts of the whistle in recognition of his signal and that as he passed him the flagman yelled "look out for the section gang." The flagman was about a quarter of a mile west of the farm crossing. The engineer said that as he was approaching the farm crossing he was running twelve to fourteen miles per hour and that he could have made an ordinary service stop in forty to fifty feet and an emergency stop in twenty-five to thirty feet. He was not able to see the section men at work until he got near the farm crossing (about 200 feet) because of the farm buildings. He said that after he came around the first curve he had a clear view of the track for about a quarter of a mile

and as far as the farm crossing; and that while approaching it he had his head out of the side window looking in that direction. He said that he did not see plaintiff. He said that when he was some little distance east of the crossing he got the highball signal from the section foreman and answered it with two blasts of the whistle and proceeded on at increased speed.

Defendants' evidence was that plaintiff was found about 150 feet east of Grubbs crossing eight or ten feet from the track; that the section men could hear the train whistle for Missouri City, heard also two torpedoes exploded by the flagman, and two blasts of the whistle to answer the flagman; that the train was running eight to ten miles per hour at Grubbs crossing; and that a dark object was seen to fall from it (back of the tender) after it passed the crossing. Defendants' flagman said that plaintiff came to where he was stationed on the track and stopped and talked for about three quarters of an hour. He said that plaintiff told him he was going to Lathrop, where his sister lived (which he could do by going east to the Santa Fe instead of west with the section men); and that plaintiff said: "I believe I'll catch this train if you slow it down slow enough." Defendants' theory was that plaintiff fell while attempting to board the moving train. Plaintiff, on cross-examination, said: "I do not remember whether I saw a man there flagging trains or not. . . . I may have had a conversation with him but whether I did I do not remember." Plaintiff, in rebuttal, however, positively denied that he ever said he was going to jump on the train, and denied that he did attempt to do so.

Defendants' first contention on the demurrer to the evidence is that there is no evidence that the engineer actually saw plaintiff on the track in a position of imminent peril and oblivious thereto in time to have thereafter prevented his injury. It is true that there was no direct evidence that the engineer saw plaintiff. However, there was the following circumstantial evidence. Plaintiff said he walked right down the middle of the track, at least, all the way from the point where the flagman was stationed on the first curve to the farm crossing, without looking back and without seeing or hearing the train until about the moment it struck him. Two section men said they saw him just before he reached the crossing walking with his back to the train which they saw from 100 to 200 feet behind him. Grubbs also said he saw plaintiff on the track and saw the train approaching him from behind until both passed out of his view near the crossing. After the train passed the first curve, the engineer had a clear view all the way to the crossing, and when it reached the point where the section men said they saw both plaintiff and the train, he could see more than a quarter of a mile beyond it. The engineer said that he had orders to look out for the section crew on the tracks; that the flagman also told him to look out for the section men; that he was looking out in the direction of the crossing, with

his head sticking out of the side window of the cab, all the way from the place where he passed the flagman until he received the foreman's highball signal after passing the Grubbs' crossing; and that he could have stopped at any time within thirty to fifty feet. His testimony was not merely that he did not see plaintiff on the track, but that he did not see him at all. Plaintiff must have been somewhere near the track because there is no doubt that he was found close to the farm crossing, after the train passed, in such condition as to make it apparent that he was injured in some manner connected with the passing of the train. Certainly there was substantial evidence that plaintiff was where the engineer could have seen him for a considerable distance ahead if he was looking in the direction and during the time he claimed that he did keep a lookout. The jury had the right to believe that plaintiff was where these witnesses said he was and, if they did believe that, then it was for them to determine whether or not they believed that the engineer did see him in time and was negligent.

In similar situation this court said:

"It is a general rule established in this State that to look is to see. That has been applied particularly to the one guilty of contributory negligence in crossing a railroad track in front of an approaching train in plain sight. There is no reason why that should not apply to operatives of a train when approaching a person in danger on the track. If the defendant's witnesses had not testified upon this point and we had only the evidence for the plaintiff to the effect that he was on the track while the train was coming several hundred feet, where he could plainly have been seen by the operatives of the train, where they had reason to expect some one to be on the track, and where it was the standing order for them to keep the bell ringing as they approached, certainly it would be a question for the jury whether they saw Beck during that approach. The fact that they testified they did not see him, testimony which the jury were not obliged to believe, does not destroy the inference they might draw from these facts. That is to say, if a prima facie case is made out upon a point, that prima facie case is not destroyed by evidence of the other side to the contrary." [Beck v. C., R. I. & P. Railroad Co., 327 Mo. 658, 37 S. W. (2d) 917.] (In short, evidence of looking is circumstantial evidence of seeing.)

Defendants' second contention on the demurrer is that plaintiff's testimony was unreasonable, unbelievable, and contrary to physical laws. Part of this argument involves the weight and credibility of evidence. We have never ruled that a judgment would be reversed on appeal for these reasons because under our system of procedure such matters are left to the trial court. [Dunn v. Alton Railroad Co., 340 Mo. 1037, 104 S. W. (2d) 311.] The argument on impossibility is that the train was moving too slowly to knock plaintiff eight or ten feet off the track where he was lying after it passed. Plaintiff's

case is not necessarily based on a finding that he was knocked that far by the train and all evidence as to speed and distances only purported to be approximate estimates. Plaintiff's evidence is not inherently impossible and these matters were properly for the jury. [Hardin v. Illinois Central Railroad Co., 334 Mo. 1169, 70 S. W. (2d) 1075, and cases cited.] We hold that the court correctly ruled the demurrer to the evidence.

Defendants also assign error in plaintiff's Instruction No. 3. This was plaintiff's main instruction, which authorized a verdict if the engineer "saw or by the exercise of ordinary care on his part could have seen plaintiff on said track" in a position of imminent peril in time to have prevented his injury by warning, slackening speed, or stopping, if the jury further found that, at the place where such imminent peril arose, defendant "could reasonably have expected to find persons on said track at said place on account of the continuous use thereof" by the public as hypothesized in this instruction. Defendant contends that the pleadings did not authorize this submission. While the petition does definitely allege that plaintiff was seen by the engineer and does not clearly show that any other separate and distinct theory of recovery was relied upon, we prefer to dispose of this matter upon the evidence (which came in without objection) rather than upon the ground that this instruction was broader than the pleadings. Plaintiff's evidence on this issue showed the following facts: Missouri City and Excelsior Springs Junction were three miles apart and the Grubbs farm was about half way between. There was a public road which paralleled the railway right of way on the north all the way between these two stations, and the railway maintained a fence between this road and the tracks. The Missouri River was on the south side of the tracks until they curved around the Grubbs farm buildings, which the railway owned and leased to Grubbs. Land on the north side of the public road was owned by Grubbs. There was no fence for about a half mile east of Missouri City but there were stock pens and a side track at the east side of the town. Plaintiff's pictures show a fence north of the tracks at the Grubbs farm. There were no cattle guards between Missouri City and the Grubbs farm and no signs prohibiting walking on the track. The public road was not oiled or surfaced in any way in 1924. It would be muddy in wet weather and got dusty when it was dry. All passenger trains stopped at the Junction but only one or two a day stopped at Missouri City, so that people would walk between these stations to and from the fast trains. Some used the public road and some used the railroad tracks.

The character of the use of the tracks shown by plaintiff's witnesses (undertaking to avoid repetition about matters related by many) was as follows:

"(Fancher) During the course of some thirty odd years that I have lived here in Missouri City, I have observed people, pedestrians or

footmen, using the tracks of the Wabash Railroad Company east of Missouri City and between Missouri City and Excelsior Springs Junction. I think about an every day occurrence—somebody. . . . Doctors, lawyers, traveling men, carpenters, railroad men, tramps, . . . use the railroad as a footpath. . . . My place runs back to this track here in Missouri City. That's where I saw them, from my place.''

''(Merens) Between Missouri City and Excelsior Springs Junction, and particularly as far east as Ralph Grubbs' home, people use the railroad track to walk up and down the track; like, especially, here so many people come down and just walk the railroad track to see the river. . . . I see them every day. . . . People who want to use the track, going to and from the farms, or when the weather is bad, use the track at various times, just—it's no particular hour or—people just use the track as they please. . . . Especially in bad weather, farmers use it to walk to town on and people just use it; a lot of people live here in town that work east of here, at various times. Especially in harvest time, why, they use the railroad track a great deal. That's the men that they hire, you understand, that come down to help shock wheat or hay or gather corn. . . . They have used the regular track, 30 years or more. . . . The right of way is fenced from the stock track east but there's no right of way fence along from west of my place there up practically to the city limits. . . . They cut these local trains off here, the people have to go to the Junction to catch No. 3 to Kansas City, now, you see. That's the time of day you see them using the track. It isn't every day that people go from Missouri City or come into Missouri City. . . . It's just occasionally that I see them on the tracks there going down to the Junction, just occasionally. Some of them use the wagon road and some of them don't.''

''(Grubbs) Within Missouri City and adjacent territory around four or five hundred people live. . . . If you get upon the railroad track and look up and down the track you could see the outline of a path between the rails. That was the place where people walked as a general thing. I have observed people walking along that track before Mr. Mulholland got hurt. People used it as a general thing. There would be somebody going along very near every day.''

''(Roy Pence) In 1924, and years before that I had occasion from time to time to be down where I could see the tracks. I would say once or twice a month, sometimes oftener, because I used to haul corn out of the bottoms there. . . . I cannot now recall any time that I ever went down in that locality near the Grubbs farm and east of Missouri City in 1924, and years preceding that that I did not see anybody walking up and down the track. It was very common to see people on the track. It was used generally. . . . People that lived over there that went to Missouri City, when the road was wet and muddy or when it was dry and dusty, took to the railroad track

most of the time. That was the general way to go. . . . That is a potato country, and was in 1924, and years preceding it. The potato industry brings in a lot of outside labor and help in the spring and fall seasons in the way of potato pickers and cutters. The most of them lived in Missouri City. The Missouri River runs close to the railroad track between Excelsior Springs Junction and Missouri City. In 1924, and years before that hunters and fishermen came from Kansas City and other places out there to enjoy the sports along the river. Some would come and leave their cars at the town and walk down the track to hunt and fish.''

''(Minick) I walked the railroad tracks up there. I am going to tell you the truth because it was muddy. Since they got the oiled road I take the road, but it is just as dangerous as the railroad track because you are continually meeting a car or passing one. . . . When it was muddy I always walked on the railroad track. Nobody ever told me not and I didn't know any better. Other people done just like I did. I had men walk there with me on the railroad track. When it was dry and dusty and the roads were thick with dust we walked on the railroad lots of times there. Back in 1924, and before that, it was always a common thing to see people on the railroad. That was true of the part east of Missouri City and up to the Grubbs farm. . . . There were a great many coal miners there in 1924, and years before that and they would walk to the Junction. . . . This coal mine is on the west side of Missouri City.''

''(Ruth Pence) In 1924, and for some years before that, I was along there frequently from time to time. I never was there that I didn't see people walking on the tracks east of Missouri City two miles or more east of Missouri City in the neighborhood of the Grubbs' farm, walking back and forth, going in either direction. . . . I have seen hundreds of them, all classes of people. . . . If you are walking down the railroad track, you have a view of the river. . . . I have seen people taking a walk to see the river. . . . There are a great many bums and hoboes that walk along that track. That is what they look like.''

''(Lloyd) Most every time I went up to the city somebody was walking along the track from Missouri City and up to the Grubbs' farm. That has been the condition ever since. Farmers and people living around Excelsior Springs Junction and between Excelsior Springs Junction and Missouri City, if they didn't go in cars, they usually walk up the track going to Missouri City. If they were going home and didn't catch a ride they generally walk down the railroad track. . . . In 1924, the duck hunters and people from Missouri City when they went hunting generally went past the Grubbs farm, down the track. It was very common to see them, you didn't think anything about it. People coming there who were strangers to hunt and fish. Some of the fishermen had cabins and lodges there. . . .

Quite a few coal miners live around there. In the summer—in the season when the rabbits are young, they walk down the track to kill rabbits. . . . When they were working on the river the boats were along there and some would go to see the boats."

"(Clevenger) Most any time I was along there I would see someone on the track. The use of it seemed to be general, people picked that as a way to walk when they was on foot. The farmers east of Missouri City when they wanted to go any place and walk, they went up the railroad track. There always has been, in and around Missouri City, a good many coal miners. I think they used the track to walk on occasionally. . . . The potato industry would bring in there at least two seasons of the year, foreign workers and transit workers who engaged in the work of potato picking and cutting. They were all strangers to me. They would stay with farmers and work out of Missouri City. When they walked, they went down the track to the farms there."

Plaintiff seeks to establish, by this and other similar testimony, that the railway was not entitled to expect a clear track at any point on the three miles of track between these two stations, where these tracks ran through open fields in the Missouri River bottoms and where so far as the evidence shows and plaintiff's pictures disclose there were only a few scattered farm houses. Only a few hundred people lived in the entire territory, including both stations and all the intervening farming district. Although we have a statute (Sec. 4761, R. S. 1929, Mo. Stat. Ann., sec. 4761, p. 2144) forbidding any person (not an employee) from walking upon railway tracks, nevertheless, Missouri courts have been extremely liberal in holding that evidence of a limited and even somewhat infrequent character of public usage of certain places on or certain portions of railroad tracks is sufficient to place upon trainmen the duty to keep a lookout thereat. However, this rule of waiver of the right to expect a clear track has always been applied to places *of limited extent* around which there is a considerable population in cities or towns, or which is continuously used for access to shops, mines, industries, work camps, schools or other similar places where a considerable number of people go regularly at certain times. [Eppstein v. Missouri Pacific Railroad Co., 197 Mo. 720, 94 S. W. 967; Ahnefeld v. Wabash Railroad Co., 212 Mo. 280, 111 S. W. 95; Savage v. C., R. I. & P. Railroad Co., 328 Mo. 44, 40 S. W. (2d) 628; Yakubinis v. M.-K.-T. Railroad Co., 339 Mo. 1124, 100 S. W. (2d) 461.] We are cited no case and know of none which has withdrawn as much as three miles of track, in an open sparsely settled rural district, from full use of a railway with the right to expect a clear track. If a case could be made under the circumstances and character of use shown here, we do not see how a railroad could ever have the right to expect a clear track anywhere

in this State. This question is usually for the jury but there must be some reasonable limits to the application of any rule.

This court, in the picturesque language of Judge LAMM, has stated the proposition thus:

"The easement of railway companies in their tracks and rights of way, from the very necessity of the things, is deemed in the first instance a paramount and exclusive one. For instance, trains run at great speed, both by day and by night. The property of shippers, the life and limbs of passengers and trainmen are all fettered to, and bound up with, the proposition that trains should have a clear track in the country and between crossings. If we gave way to any other view, we would open a floodgate for manifold wrongs to the traveling public and public service corporations, to enter, and there would be 'fine' grinding in the mill when the waters of that flood came in. If A and B at their own, and against defendant's will, may appropriate defendant's track for their private walking, then, by that token, they may also appropriate the track for the use of their horses, their asses, their sheep, their swine, and horned cattle. . . .

"It must be evident that railroad companies are, in a sense, defenseless against such misappropriation of their tracks by footmen. They fence the right of way, they protect the track by cattle guards, and, in this instance, defendant kept up notices and signs warning the public and protesting against their use of its track. We are brought, then, face to face, with this asking proposition: what more can a railroad company do, or should it be required to do, to protect itself against appropriation of its track by footmen, who are *sui juris*, than was done in the case at bar? Shall it employ armed guards? Shall it build fences that cannot be scaled, crawled through, or broken down? Shall it plant spikes in its cattle guards to the danger of its own employees? Or use pitfalls? Or what can it do? We confess our inability to answer." [Frye v. St. L., I. M. & S. Railroad Co., 200 Mo. 377, 98 S. W. 566.]

In the Frye case the court, recognizing the exception that a railway "may know of and acquiesce in the use of portions of its track by the public" and thereby "waive its right to a clear track," nevertheless held that the use shown over a one mile section of track between two stations was not sufficient to make a case of waiver of the right to a clear track thereon in the nighttime. As to the effect of the daytime use in that case, the court was not called upon to decide. The Frye case has been recently referred to and followed by this court in Crossno v. Terminal Railroad Assn., 333 Mo. 733, 62 S. W. (2d) 1092. In the Crossno case this court restated the limitation upon the rule of waiver announced in the Frye case that "to bring a case within that rule, the use established in the public may be likened somewhat to that giving rise to a prescriptive right; i. e., the use must be a known use, and must be confined to the limits proved."

Whatever use there may have been in and around the east limits of Missouri City, where there was a side track for stock pens and for loading potatoes, or as far as the coal mine on the other side of town, this evidence does not tend to show use of such a character with sufficient acquiescence therein over the whole three miles between the two stations to make a jury issue on waiver of the right to a clear track over the whole distance; and where there was a public road paralleling the railroad, which provided sufficient means of travel between the two stations. This road was fenced from the tracks for at least a mile east of the Grubbs farm. Evidence of people leaving this highway, where the railway had placed a fence to prevent it, to get a view of the river or to get out of mud or dust shows a use of a temporary, infrequent and sporadic character rather than the usual and customary way travelers might be expected to go. (There was no evidence as to mud or dust on the day in question and even a public highway can be withdrawn from public use while it is being repaired or reconstructed.) As suggested by Judge LAMM in the Frye case, if persons could acquire the right to travel the whole three miles on foot, why not also on horseback, or by automobile when chains were required to navigate the muddy road or when dust made it unpleasant. We do not think the doctrine of waiver of the right to a clear track ought to be carried so far, and we hold that plaintiff was not entitled to submit the case on that theory. Plaintiff's Instruction No. 3 was therefore prejudicially erroneous.

The fact that plaintiff was at or near the Grubbs farm crossing did not change the situation. In the absence of known frequent public use, there would be no duty to keep a lookout for the general public at a private farm crossing. [Voorhees v. C., R. I. & P. Railroad Co., 325 Mo. 835, 30 S. W. (2d) 22, 70 A. L. R. 1106; 52 C. J. 175, sec. 1770; 22 R. C. L. 955, sec. 193; see, also, Bryant v. Missouri Pacific Railroad Co., 181 Mo. App. 189, 168 S. W. 228, as to use for farm purposes and where there was also public use shown.] ██ Section 4761, Revised Statutes 1929, provides for "necessary farm crossings of the road, for the use of the proprietors or owners of the land adjoining such railroad." There was no instruction submitting the case on the theory of duty to keep a lookout at this private crossing and plaintiff made no claim of a duty to him on the ground that he had any intention to visit the Grubbs farm or that he was using it for any purposes of a farm crossing. [See Karr v. C., R. I. & P. Railroad Co., 341 Mo. 536, 108 S. W. (2d) 44, decided concurrently herewith.] Our conclusion is that the only theory under the humanitarian rule, which plaintiff was entitled to submit to the jury, was that the engineer (in time to act effectively) actually saw him on the track ahead of the train oblivious to its approach. What we have ruled concerning the proper theory of liability under the evi-

dence makes it unnecessary to rule on assignments of error as to other instructions.

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C.. is adopted as the opinion of the court. All concur, except *Douglas, J.*, not voting because not member of the court when cause was submitted.