GEORGE F. KARR v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, a Corporation, Appellant.—108 S. W. (2d) 44.

Division One, July 30, 1937.

*Luther Burns, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

538

*Pross T. Cross, Gerald Cross, Guy W. Green, Jr.,* and *Trusty & Pugh* for respondent.

FERGUSON, C.—Plaintiff was employed by the defendant Railway Company as a flagman or watchman at the crossing of a street over defendant's railroad tracks in the city of Columbus Junction, Iowa. On October 20, 1931, a collision between an automobile and one of defendant's interstate passenger trains occurred at this crossing. The automobile was thrown from the track and struck and injured plaintiff. Alleging that the injuries sustained were the proximate result of certain enumerated negligent acts and omissions of defendant, plaintiff brought this action under the Federal Employers' Liability Act. Upon a trial in the Circuit Court of Clinton County, plaintiff had verdict, and judgment thereon, for damages in the amount of $15,000. Defendant's appeal therefore comes to this court.

Defendant, as appellant, asserts: (1) That its request for a directed verdict, at the close of all the evidence, should have been

granted and that the trial court erred in refusing same; and (2) that, if it be held a submissible case was made, certain instructions given at plaintiff's request were erroneous. By first giving an outline of the general situation shown by the undisputed facts and a statement of the evidence relied upon by plaintiff as showing actionable negligence we can perhaps more clearly develop plaintiff's theory and the applicable law.

Defendant's railroad tracks run north and south. The business section of the city of Columbus Junction (Iowa) is west of the railroad tracks. Main Street runs north and south and from building line to building line is eighty feet, and from curb to curb sixty feet, in width. Walnut Street is an east and west street. It intersects Main Street and continues east crossing the railroad tracks. This is the crossing at which the collision occurred. Two, north and south, railroad tracks cross Walnut Street. The west track is referred to as "the passing track," the east track is the "main line track." The train involved in the collision was an interstate passenger train traveling north on this east or main line track. The following measurements and distances should be noted: it is four feet and eight and one-half inches between the rails of the tracks; from the east rail of the west (or passing) track to the west rail of the east or main line track is approximately eight feet (seven feet and eight inches); it is ninety-three feet from the center of Main Street to the center of the main line track; from the east line of Main Street to the west rail of the main line track (on which the collision occurred) is a distance of approximately, and not exceeding, fifty-one feet; and at the east line of Main Street Walnut Street is thirty-nine and three-tenths feet in width, from curb to curb, but the curb line ends about six feet from (west of) the west rail of the first (the passing) track and from that point and crossing the railroad tracks Walnut Street narrows to thirty-four and three-tenths feet in width. There is an unbroken row of two and three story brick business buildings on each side, both north and south, of Walnut Street, between the railroad right of way and Main Street, fronting on Main Street, the rear extending to or near to the railroad right of way. The first building south of and abutting on Walnut Street is two stories in height as it fronts on Main Street and three stories at the rear overlooking the right of way. It extends east along Walnut Street from the east building line of Main Street approximately twenty-four feet. There is a descending grade on Walnut Street from Main Street to a point near the west (or passing) track, about seventeen feet west of the center of the main line track, of about twelve per cent. From the point mentioned and over the tracks and east thereof the street is "practically level." The crossing is in full view of persons traveling east on Walnut Street toward it

for more than a block west of and before getting to the west side of Main Street. The station building is east of the main line track and about 400 feet north of the crossing of Walnut Street over the tracks, the south end of the platform being about 212 feet from the north side of the crossing with a concrete walk extending from the south end of the platform to the crossing. The station park or grounds extend south to Walnut Street, so it appears that a train stopping at that station would travel but little more than two hundred feet north of the crossing to come alongside the station platform.

For nine years prior to this time plaintiff had been employed by defendant Railway Company as a crossing flagman, seven years at St. Joseph, Missouri, and two years at Columbus Junction, Iowa. He was slightly lame, had infantile paralysis when a child, his ankles were "double jointed" and he wore braces on his legs. His hours on duty at this crossing were from seven A. M. to six P. M. A small "flagman's building" is located on the south side of Walnut Street about thirty-six feet east of the crossing. The Columbus Junction station was a regular scheduled "stop" of the passenger train involved and it "always stopped" there. It was due at this station at seven-twelve A. M., and on this morning "was running on time." Plaintiff says his duties as "flagman" at this crossing were, "to protect that crossing . . . when a train was coming to be out there on the crossing to flag and warn people approaching the tracks on Walnut Street that a train was coming." Plaintiff was supplied with and used a warning sign, a large metal disc on which was the word " 'stop' in large letters." The disc was attached to a "wooden handle" about "4½ feet in length." When a train was approaching the crossing on the main line track plaintiff would take a position in the center of Walnut Street, about fifteen feet east of the main line track (the east track), face toward the west, "rest the end of the handle" of the stop sign on the street, holding it with his right hand, and move the sign slowly from north to south. When the sign was in this position the top of the "metal disc" was "about even with" his "head."

On the morning of this collision plaintiff heard the train whistle first when it was yet "a mile away" whereupon he took his usual position with the stop sign in the center of Walnut Street, east of the main line track, as just described, and gave warning of the approach of the train to persons traveling toward the crossing on Walnut Street. J. B. Gookin coming from the west was driving an automobile east on Walnut Street intending to go over the crossing. As he came to Main Street he saw plaintiff "flagging the crossing" and he thereupon stopped his automobile about the east line of Main Street to await the passage of the train. Also one Seiler

driving an automobile truck west on Walnut Street, east of the crossing, seeing the warning given by plaintiff stopped the truck about thirty feet east of the crossing to await the passage of the train.

The automobile involved in the collision was a "1926, model T. Ford roadster" owned and driven by Rusler Karr, plaintiff's brother. Rusler Karr operated a "filling station" on Walnut Street about two blocks west of Main. He was thoroughly conversant with this crossing and the scheduled time of this northbound passenger train. He daily drove over this crossing and visited with his brother at the flagman's building east of the crossing. On this morning he started from the filling station in his Ford roadster to visit his brother, the plaintiff, at the flagman's building. He invited Joe Church to ride. Church, a barber, operating a barber shop on the east side of Main Street, "two doors north of Walnut Street," was on his way along Walnut Street to his shop. Church accepted the invitation and with Rusler Karr driving they started east on Walnut Street. When they got into Main Street and were yet west of the center of the street, a one hundred feet or more from the main line track, Rusler Kerr says he saw plaintiff standing in the center of Walnut Street, east of the main line track, flagging traffic on Walnut Street and he knew then that this train was coming from the south on that track. The automobile continued across Main Street, passed the Gookin automobile (which heeding the flagman's signal, as mentioned, had stopped near the east line of Main Street), continued east on Walnut Street and, with speed unchecked, crossed the passing track and went onto the main line track where it was struck by the train and thrown toward the east striking and injuring plaintiff. Church says, that he knew the "train was coming;" that he told Rusler Karr "to stop, a couple of times;" that Karr "made an attempt to stop" but he (Church) saw that the automobile "was not going to stop" and he jumped out; that at the time he jumped from the automobile it was moving at twenty or twenty-five miles an hour and that he went forward running to avoid falling; that he ran south "at an angle" west of the passing track and back of the buildings west of the right of way. Rusler Karr testified that he suffered "a stroke of paralysis" in 1928 which "affected my left side, arm and leg both;" that, as heretofore mentioned, he knew while yet west of the center of Main Street, a level street, that this passenger train was coming from the south on the main line track; that he "tried to stop" but "the foot brakes wouldn't hold;" that he could not "use the emergency brake . . . on account of my left arm being paralyzed;" that the automobile, at all times, moved at a speed of about twelve miles an hour; and that as it crossed Main Street and approached and went onto the main line track the speed neither in-

creased nor slackened. A local automobile mechanic examined the brakes on the automobile, on the day following the collision, and, called as a witness for defendant, testified, that the "brakes were worn so they would not hold."

Plaintiff testified, that, as he stood about fifteen feet east of the main line track flagging the crossing, he first noticed his brother's automobile a block west of Main Street coming east on Walnut Street; that the automobile continued across Main Street and toward the railroad crossing without checking speed, traveling on the south side of Walnut Street "three or four feet from the curb;" that he thought his brother "could stop;" that the automobile was not moving so fast as to cause him to think it would not stop by the time it reached the passing track (the west track); and that he did not think "it was not going to stop until it got to this passing track" (it is 12 feet 8½ inches from the west rail of the passing track to the west rail of the main line track). At another place plaintiff says that the automobile had come to within "about 8 feet" of the passing track "when" he "first suspected that it would not be able to stop," which would make the automobile at that instant twenty feet and eight and one-half inches, or approximately twenty-one feet, from the west rail of the main line track moving at a speed of about twelve miles an hour. Plaintiff says that when he "got that impression" or "feeling" that "the automobile wasn't going to stop" he "stepped forward" about three feet, to within about twelve feet of the track; that the "front of the train" was then "40 or 45 feet back" (south of the south line of the crossing) and the train was moving at a speed of "16 or 18 miles an hour;" that upon stepping forward he turned and faced south toward the train (until then he had continued facing west) and that, holding the stop sign in his right hand, he waved his left hand toward the train, "jumping up and down and screaming."

Plaintiff apparently would draw upon certain testimony of defendant's fireman, called as a witness by defendant. The fireman was keeping a lookout ahead from the west side of the cab of the north-bound engine, the side from which the automobile approached the track. He testified that when the "front of the engine was just south of the (south) edge of the crossing" he saw the automobile come from behind the building, which we have described, situate at the southeast corner of Main and Walnut streets, fronting on Main and extending approximately twenty-four feet east adjacent to Walnut Street. It will be recalled that the east line of this building is twenty-six and seven-tenths feet from the west rail of the main line track. The fireman says about half of the automobile came into view at the instant he first saw it clearing the building line, thus it appears that the front of the automobile, at that point of time, was at the approximate distance from the main line track at which plaintiff says he first realized or "got the impression" the automobile

was "not going to stop" and upon appreciation of that fact stepped forward, faced south and waved his left hand at the train; this is confirmed by the fireman's stated estimate that when he first saw the moving automobile the front was, then within "20 or 22 feet of the main line track." The fireman further testified that the instant he saw the moving automobile emerge from the building line he called, "whoa" to the engineer, an emergency signal, and the engineer "immediately cut into an emergency application." The train came to stop on and "blocking" the crossing. The train was composed of engine and tender, "mail car, baggage car, chair car and sleeper." When the train came to a stop the north end of the chair car, the third coach, was south of the south side of the crossing, just how far is not clear but as stated by the conductor, called as a witness by plaintiff, it seems that about half of the length of the coach north of and preceding the chair car extended south of the south side of the crossing.

The conductor, plaintiff's witness, stated that the train approached the crossing at a speed of ten to twelve miles an hour, the fireman and engineer also estimated the speed of the train at ten to twelve miles an hour while plaintiff, as we have noted, estimated the speed of the train at sixteen to eighteen miles an hour. Plaintiff produced one Lindley, an ex-locomotive fireman and engineer, as an expert witness. He testified that with track, weather conditions, and air braking equipment such as admittedly existed a train composed of the four coaches making up this train moving at speed of ten to twelve miles per hour could be stopped, with safety to the train and persons on it, "within 30 feet" (presumably he meant after the air "took hold" or became effective), and that moving at sixteen to eighteen miles an hour it could be stopped "within 40 feet." The following is the whole of plaintiff's evidence in reference to slackening speed of the train. We quote, the question and the answer of plaintiff's expert witness Lindley:

"Q. Now, if it could be stopped within thirty feet, about how much could it be slowed down in twenty feet; what I am getting at is, if it slowed down, how much more time would it take to cover a given distance, say twenty feet? A. It would take—I should judge, twice the time."

Plaintiff's petition charged as negligence, violation of a city speed ordinance and a yard speed limit rule; operation of the train at a dangerous and excessive rate of speed under the circumstances; failure to sound the statutory crossing signals; and that the enginemen knew or by ordinary care should have known that plaintiff was in a situation of imminent peril in time by the exercise of proper care to have prevented the injuries to plaintiff "either by stopping said train or sufficiently slackening the speed, or giving due warning," but "negligently failed in said respects." The purported speed ordi-

nance was excluded by the court as not authorized or valid under the law of Iowa. There was no evidence whatever that the speed of trains at this crossing was limited by a yard rule. The undisputed evidence is that the usual crossing signals, by both bell and whistle, were sounded and that both plaintiff and his brother were fully aware of the approach of the train. Plaintiff's brother admittedly knew, and was fully aware, of the approach of this train on this track, while the automobile was yet on the west side of Main Street, in ample time to have stopped the automobile and he could and would have done so but for the fact that the foot brakes would not hold or because of his crippled condition he was unable to use the emergency brake, or both. So full knowledge and appreciation by all the parties of the approach of the train eliminates the alleged failure to warn as a ground of actionable negligence. Plaintiff not only abandoned the alleged grounds of negligence just mentioned but also failure to stop and sought recovery, as submitted by his two principal instructions, upon the theory, first, that defendant's enginemen, by the exercise of proper care, could have sufficiently slackened the speed of the train and thereby have averted the collision with the automobile after the fireman saw the automobile emerge east of the building line and after the plaintiff turned and faced toward the train and waved his left hand but negligently failed to do so; and, second, that the train was operated at a dangerous and excessive speed under the circumstances.

Plaintiff having abandoned the other specifications of negligence set forth in the petition we confine ourselves, upon the demurrer to the evidence, to a determination of the question whether under the evidence, viewed in the light most favorable to plaintiff, and the applicable law, a case was made for the jury on the grounds of negligence relied upon, and submitted, by plaintiff as above stated. [Krinard v. Westerman, 279 Mo. 386, 396, 216 S. W. 938; Bello v. Stuever (Mo.), 44 S. W. (2d) 619; Shumate v. Wells, 320 Mo. 536, 9 S. W. (2d) 632.]

This action is under the Federal Employers' Liability Act. [45 U. S. C. A., sec. 51.] The provisions of that act, applicable here, make the railroad company liable in damages to an employee, who is within the act, for injury resulting in whole or in part from the negligence of any of the employees of the company. The injury must be the result of negligence on the part of fellow employees and in this instance negligence of the enginemen in the operation of the train. "There can be no actionable negligence in the absence of some duty which has been neglected or violated, and hence in order that a person may have a cause of action on account of an injury resulting from negligence it is necessary that the act or omission complained of should have involved some breach of duty owed to him." [45 C. J., p. 639.] Ruling Case Law states the elements of actionable negligence as follows: "In order to constitute actionable neg-

ligence there must exist three essential elements—namely, a duty or obligation which the defendant is under to protect the plaintiff from injury; a failure to discharge that duty; and injury resulting from that failure." [20 R. C. L., Negligence, sec. 7, pp. 10, 11.] It is not sufficient for complainant to show that he has been injured by the failure of another to perform a duty or obligation unless that duty or obligation was one owing to complainant. [Chesapeake & Ohio Ry. Co. v. Mihas, 280 U. S. 102.] Nor is it "sufficient to show that the defendant owed to another person or class of persons a duty which had it been performed would have prevented the injury complained of" (20 R. C. L., p. 47, sec. 41) and the "mere fact that the act or omission complained of involved a breach of duty owed to some person or persons other than the complaining party does not give the latter any right of action." [45 C. J., pp. 647, 648; McGillivray v. Great Northern Ry. Co., 145 Minn. 51, 176 N. W. 200; Cincinnati, N. O. & T. P. Ry. Co., v. Swann's Admx., 160 Ky. 458, 169 S. W. 886; Coleman's Admx. v. Pittsburgh, C. C. & St. L. Ry. Co., 139 Ky. 559, 63 S. W. 39; Griffith v. Atchison, T. & S. F. Ry. Co., 132 Kan. 282, 295 Pac. 687; Norfolk & W. Ry. Co. v. Kratzer, 37 Fed. (2d) 522.] Clearly to be actionable negligence the injury complained of must result from the violation of a legal duty owed by defendant to the injured party. [Feeback v. Mo. Pac. Ry. Co., 167 Mo. 206, 215, 66 S. W. 965, 967; Roddy v. Mo. Pac. Ry. Co., 104 Mo. 234, 15 S. W. 1112; Davidson v. St. Louis-San Francisco Ry. Co. (Mo.), 229 S. W. 786, 788; McGuire v. Chicago & Alton Railroad Co. (Mo.), 178 S. W. 79; Zitzmann v. Glueck Box Co. (Mo.), 276 S. W. 23; Blavatt v. Union Electric Light & Power Co., 335 Mo. 151, 71 S. W. (2d) 736. See, also, Palsgraf v. Long Island Railroad Co., 248 N. Y. 339, 162 N. E. 99; 59 A. L. R. 1253.]

It follows that we are not then primarily concerned with the duty which the defendant and its trainmen owed either to passengers on the train or travelers on and near this crossing in the operation of its train. As stated, supra, no cause of action accrues to plaintiff on the theory that had the trainmen performed some duty which they owed to travelers on the street at and near the crossing, or to passengers on the train, the collision would not have occurred and he would not have been injured. ▮ What then was the nature and extent of the duty of the enginemen to protect plaintiff, a crossing flagman? Plaintiff seemingly does not controvert the proposition that he came within the general rule, recognized both by the Federal courts and the courts of this State, that a railroad employee working on or about the tracks is under a duty to look out for his own safety and that the employees of the railroad engaged in the operation of trains owe him no duty to look out for him or take measures for his protection unless and until they discover him in a position of peril in time thereafter, by the exercise of ordinary care, to avert

injuring him. Applied to this case it was plaintiff's duty to discover and look out for the approach of trains to this crossing and warn travelers on the street thereof, "protect the crossing," that trains might have a clear track, and in doing so to look out for his own safety, and the enginemen owed him no independent duty to be on the lookout for him, sound warnings, regulate or retard the speed, or take other precautionary measures for his benefit or protection unless they discovered him in a position of peril in time, as stated supra, by the exercise of ordinary care, to avert injury to him.

This leads us to a consideration at this point of the charge of excessive speed under the conditions existing at this crossing. The train was running "on time." There is no evidence that it was running at other than its usual and customary speed as it approached the crossing. It was to make its regular stop at the station but a few hundred feet north of this crossing and presumably was traveling at a rate of speed which would permit of the usual and ordinary station stop. The railroad company had apparently taken reasonable precautions to protect travelers on the street. One purpose of placing plaintiff at the crossing was to afford trains a clear track. It was not to be reasonably anticipated that an automobile driver would flagrantly disregard the plain and certain warning and go upon the track in front of an approaching train nor was it to be reasonably anticipated that a driver physically unable to operate the emergency brake might be driving an automobile with inefficient foot brakes and on that account unable to stop his automobile upon timely warning by the crossing flagman of the train's approach. All the witnesses, except plaintiff, who had any opportunity to judge of the speed of the train, placed the speed as it approached the crossing at ten to twelve miles an hour; plaintiff's estimate was sixteen to eighteen miles an hour. We think it very doubtful that excessive speed under the circumstances was shown. But accepting plaintiff's estimate of the speed, the duty, if any there was, to approach the crossing at a lesser speed, or to further retard the speed, was to, and for the protection of, the public traveling on the street toward and at or near the crossing and was not, as we have heretofore pointed out, a duty owing to plaintiff, so that the negligence, if any, of the enginemen, as to travelers on the street, in failing to regulate the speed, would not be a violation of a duty owing to plaintiff or negligence as to him, and would not afford him a cause of action against defendant on that ground.

Granting, however, that when the fireman saw the moving automobile emerge east of the building line, which as we have pointed out was almost simultaneous with plaintiff's realization that the automobile was not going to stop, whereupon he stepped forward, faced the train and waved his hand, the enginemen, being thus apprised of the situation, must then have reasonably apprehended that

plaintiff was in a position of peril, in that in the event of a collision he might be injured, a duty, on the part of the enginemen, to plaintiff arose to take active measures to avert the collision and probable consequent injury to him, our inquiry, upon the demurrer to the evidence, is directed to whether there is substantial evidence tending to show that after that time, in the exercise of proper care, the speed of the train could have been sufficiently slackened to have averted the collision, the other ground of negligence relied upon.

As to such ground of negligence plaintiff's position is that the evidence is sufficient to warrant and support an inference that the enginemen negligently failed to take proper and timely measures to avert the impending collision upon being apprised of his perilous situation. The driver of the automobile says that the right rear wheel of the automobile was "broken" and assumes that was where the engine struck the automobile. Plaintiff says the engine struck "the right hind part of the automobile." There is no evidence as to what part of the engine or engine pilot struck the automobile, or how much of the automobile extended back of the point at which it was struck or how far the pilot or other parts of the engine extended beyond the rail. But apparently the theory is that perhaps the enginemen could have acted with more alacrity and had the engineer done so in operating the emergency brake the speed of the train might have been sufficiently slackened for the automobile to have escaped. There is no evidence as to what extent and in what distance the speed of the train traveling at 16 to 18 miles an hour would be slackened after the "air took hold" or the brakes commenced to take effect. We have quoted, supra, all that part of the testimony of plaintiff's expert witness appertaining to the slackening of speed; that if the train was traveling at ten or twelve miles an hour it could be stopped "within 30 feet;" and that if it could be stopped in thirty feet it could be slowed down to one-half its speed within a distance of twenty feet. This presumably means that after the knowledge of the danger has been transmitted, received and appreciated by the engineer, who operated the emergency brake, and he has operated the brake and the brake has commenced to take effect to retard the speed of the train, the speed, if the train is moving at ten to twelve miles an hour, will be reduced one-half within twenty feet. It must be remembered that at the instant notice first came or was given to the enginemen of the impending danger the front of the automobile, moving at a speed of twelve miles an hour, was within about twenty-one feet of the main line track and that the train was forty or forty-five feet south of the course of the automobile moving at a speed of sixteen to eighteen miles an hour, according to plaintiff's testimony. The engineer testified, that when the fireman "hollered whoa," "I put the brake in emergency." There is no evidence as to the time in which the brake can be operated and then become effective

in slowing the train. "Human beings cannot work with the rapidity of electricity. Thoughts must be gathered and nimble hands put in motion." [Burge v. Wabash Railroad Co., 244 Mo. 76, 102, 148 S. W. 925, 932.] We can take judicial notice that an appreciable time was required for realization and appreciation of the situation on the part of the enginemen, action thereafter by the engineer in operating the emergency brake and for the brake to become effective, during which time the train was moving at undiminished speed. [McGowan v. Wells, 324 Mo. 625, 666, 24 S. W. (2d) 633, 639.] The automobile continued at the same speed to the point of collision.

The evidence relied upon by plaintiff to sustain this ground of negligence leaves the variable factors involved too uncertain and indefinite to admit the conclusion plaintiff attempts to make as a reasonable deduction therefrom. Upon consideration of the uncontroverted facts together with the evidence most favorable to plaintiff, as to speed of both the train and automobile, time, distance, slackening of speed, and the situation as a whole, which we have described in detail, we think it apparent that there is no substantial evidence tending to show that the enginemen did not exercise proper care and do all they reasonably could do to avert the collision, and the possible consequent injury to plaintiff, after they were apprised of the danger. To hold otherwise would require us to go beyond the limits of reasonable inference into the realm of guess, speculation and conjecture.

As there is not substantial evidence tending to show that, by the exercise of ordinary care under the circumstances, the engineer could have sufficiently slackened the speed of the train and thereby have averted the collision, it follows that no case was made for failure to stop. Though this ground of negligence, as first said, was abandoned by plaintiff since we have in the course hereof specifically disposed of all the other assignments of negligence alleged we make this further observation.

We must hold therefore that plaintiff did not make a case for the jury and that the trial court erred in refusing defendant's request for a directed verdict, which requires that the judgment of the circuit court be reversed. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.