Green C. FOWLER, (Plaintiff) Respondent,

v.

GULF, MOBILE & OHIO RAILROAD COMPANY, a Corporation, (Defendant) Appellant.

No. 29280.

St. Louis Court of Appeals.

Missouri.

Jan. 17, 1956.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 17, 1956.

Ely & Ely, Robert .C. Ely, St. Louis, for appellant.

Lloyd E. Eaker, Heneghan, Roberts & Cole, John J. Cole, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is an action brought by Green C. Fowler against the Gulf, Mobile & Ohio Railroad Company to recover damages for personal injuries sustained by him when he was struck by a falling automobile loading rack in one of defendant's railroad cars. Plaintiff was an employee of the defendant, and at the time was engaged in the course of his employment. Suit was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The trial resulted in a verdict and judgment for plaintiff in the sum of $3,200. From the judgment, defendant has appealed.

The petition alleged that on September 20, 1951, plaintiff was directed to lower and inspect, and repair if necessary, the automobile loader rack in one of defendant's freight cars; that when he proceeded to lower the rack it suddenly and unexpectedly dropped upon him and injured him. The negligence alleged was in furnishing, equipping and maintaining the hoists, gears, bolts, chains and the mechanical parts of the rack in a defective, broken and unsafe condition; failing to warn plaintiff of said condition when defendant knew, or in the exercise of due care should have known of said condition; failing to inspect and ascertain the defective condition; failing to instruct plaintiff as to the safe and proper manner of lowering such rack; and failing to provide plaintiff with proper tools and appliances, and with a safe place to work.

Defendant, by its answer, admitted the averments of the petition except the allegations of negligence, injuries and damages. Further answering, defendant alleged that whatever injuries plaintiff sustained resulted solely from his own negligence, or from his negligence directly and proximately contributing thereto, in that plaintiff knew or by the exercise of ordinary care would have known that the rack would injure him if it fell upon him, and, with such knowledge, placed himself in a position under said rack and negligently released the mechanism which held it. It was further alleged that plaintiff had been instructed to stay out from under such racks, but that plaintiff negligently failed to obey such order.

Plaintiff was employed by defendant as a car repairman at its yards in Venice, Illinois. He had followed that line of work for about thirty-four years, working for defendant and its predecessor, the Chicago and Alton Railroad Company.

Plaintiff was injured on September 20, 1951, while lowering an automobile rack in one of defendant's automobile cars. The car in question was specially designed for automobile loading, having installed therein what is known as "Evans" type automobile racks. The racks are used to raise an automobile above the floor of the car so that another automobile can be placed underneath.

There is a rack at each end of the car. They weigh between 2000 and 3000 pounds. The rack is raised or lowered by means of a chain hoist assembly located at the end of the car. The rack is suspended on arms which extend down from the ceiling of the car, and swings toward the center of the car when being lowered. At the top of the car are safety hooks to hold the rack when it is hoisted to the top of the car. The rack is held up by a cable which winds on a drum attached to a rod, which rod extends across the end of the car at the top. The rod or shaft to which the drum is attached is turned by gears contained in a gear housing, which is a part of the chain hoist assembly. The gear housing is oil sealed, and the gears cannot be seen unless the housing is disassembled.

The gears are turned in the direction desired by pulling on a continuous chain which hangs down into the car and which can be reached by one standing on the floor of the car. In the gear housing there are two gears, a bronze gear and a worm gear. The bronze gear has a key slot in the center into which the end of the shaft or rod above mentioned fits. The worm gear works below, the bronze gear and meshes with it. The action of the gears will hold the rack in whatever position the rack may be stopped. If the rod or shaft can turn in the key slot because of a defect in the gear, the rack will fall unless held up by other means. In such a situation it is of no benefit to tie a knot in the chain to prevent the chain from moving, for the reason that the rod will turn freely without turning the bronze gear or moving the chain.

Extending out and around the cable which holds the rack is a U-bolt, which is in the shape of a hairpin. This hairpin U-bolt is at the top of the car opposite the drum on which the cable winds, and if there is a slack in the cable it pulls down on the U-bolt and, by doing so, engages the brake. The brake is a long piece of metal attached to the gear housing and engages a ratchet on the cable drum, and when so engaged stops the drum from turning in the direction which permits the rack to descend; but because of the ratchet arrangement, the rack may be raised even though the brake is engaged. Plaintiff testified that sometimes the brake will stop the rack from going either up or down. If the brake is engaged and a workman wishes to disengage it manually, it is customary to use a board to kick up the brake.

In this case, the bronze gear in the gear housing was split, widening the key slot and thereby permitting the rod or shaft to turn without turning the gear. Because the gear was split, when it meshed with the worm gear it caused the hoist mechanism to stick, so that the rack could not be raised or lowered by the use of said mechanism. Plaintiff's accident occurred when he manually released the brake by use of a board, and the rack fell because it was not held by the action of the gears, as would have been the normal situation if the gears were in good shape.

Plaintiff's working partner was John C. Kelly. In the course of their work these two men reached the car in question about noon. Attached to the car was a work order which directed them to inspect and lubricate the racks. Plaintiff directed Kelly to secure a ladder so that they might enter the car. After this was done, both men got into the car. The rack at that time was against the roof of the car. It was held there by the safety hooks, one on each side of the car. Plaintiff directed Kelly to release these safety hooks, which he did. Both plaintiff and Kelly were at the end of the car. Plaintiff then pulled on the chain and lowered the rack for some distance, but when it reached a position about five or six feet from the floor, or about shoulder high on plaintiff, the brake mechanism locked. Plaintiff was about five feet, ten and one-half inches tall. The locking of the brake, according to plaintiff's evidence, was due to the fact that the U-bolt above mentioned was bent, causing the brake to drop into a locked position.

Plaintiff testified that it was not unusual for the brake on this equipment to become locked in this manner. He stated: "You will find that on nearly every car you repair." He further stated that the customary method of remedying the situation was for the workman to mount a ladder and with his hands disengage the brake. If this method should prove unsuccessful, the usual practice was to secure a board, and, while standing on the floor of the car, push up on the brake. Such board was the only mechanism available for releasing a locked brake.

Plaintiff first attempted to release the brake by hand, but was unable to do so. He then obtained a board, about ten feet, three or four inches, in length, and pushed up on the brake, but could not move it. Plaintiff then told Kelly to tie a knot in the chain and stand in the clear of the rack as there was no need of two men taking a chance of being hurt when one man could

do the job. Plaintiff then took a crowbar and placed it under the board, which was resting on the floor of the car and extending upwards to the brake lever. He first used his hands in attempting to pry the brake loose, but the brake would not move. Plaintiff then stood on the crowbar. He was in a stooped position and thought he was clear of the rack, should it come down. He was facing south toward the end of the car, and was about two feet from the right side of the car. He had his hand on the end of the car. The pressure applied by standing on the crowbar accomplished the purpose intended. The brake lever was disengaged from the ratchet and the rack fell to the floor. Upon the release of the brake, plaintiff was thrown off balance and into the path of the descending rack. He testified: "I was in the clear when I was prying, naturally, when that broke loose, that throwed me over * * *. It did unbalance me." He was struck and injured. If the bronze gear had not been broken so that the shaft moved freely independent of the gear, the rack would not have fallen when the brake was released. Plaintiff had never before had any previous experience with a defect of this kind. He testified:

"Q. I want you to state whether or not you had ever received any warning or instructions from your superiors about these gear boxes? A. No, I never did.

"Q. I mean, the gears, bronze gears, you understand what I mean? A. I never had none."

Plaintiff and his witnesses testified to various estimates as to the clearance between the rack and the end of the car at various positions as the rack would be lowered. The rack when being lowered descends toward the center of the car. When the rack was at the top of the car the clearance, according to plaintiff's testimony, was about sixteen inches. This clearance widens as the rack descends. At a point shoulder high on plaintiff, the distance between the end of the rack and the end of the car was sufficient to clear one standing in such

space. From plaintiff's testimony it would appear that the space was from 24 to 26 inches. At the end of the rack, situated at each corner, there was a brace-U, which extended out from the end of the rack for some distance, variously estimated at from 4 to 10 inches. Its distance from the side of the car was about 4 feet. When the rack was at shoulder height on plaintiff there was about a fifteen inch clearance between the end of the brace-U and the end of the car. In the position which plaintiff assumed when attempting to pry loose the brake, the brace-U was over his head and shoulders. Plaintiff was unable to state whether he was struck by the brace-U or the end of the rack.

Empty cars are brought into the Venice yards for inspection, and repair if necessary. It was plaintiff's job to inspect such cars and make necessary repairs. It was plaintiff's job to take down and replace any gear mechanism if anything was found wrong with it. Plaintiff testified:

"Q. From your experience, there—having worked with those racks before, did you feel you were competent to go in there and find out what was wrong? A. I didn't feel no other way * * * that was my duty to go in there and do that job. I felt I was competent of doing that job."

Plaintiff had worked on automobile freight cars and the racks for seven to nine years, sometimes working on one, and sometimes as many as five each day. He had worked on more than 200 cars during the time he was employed by defendant.

Plaintiff testified that he had received no specific instructions on how to lower this rack on the day of the accident, or any instructions or classroom training at any time with respect to repairing or lowering racks. He did testify, however, that he had been instructed to stay in the clear of the racks at all times. Plaintiff knew that the racks were dangerous. He testified: "You taking a chance any time you get in one of them racks. * * * I have seen them turn loose and be hit in the head a couple of times previous to that. * * *

You can't tell what they will do. * * * As long as it is in perfect condition, there ain't no danger. You can't tell what they are when they are up there and you start to lower them, you can't tell what condition they are in * * * you have to stay in the clear. That is our instructions."

Plaintiff further testified that he never had received any warning or instructions from his superiors with reference to gear boxes, but when asked if he knew the rack might fall, stated: "I always had that gear in my mind any time."

Defendant's general car foreman testified that plaintiff received no special training concerning the repairs and maintenance of these car racks, except through experience acquired from working with them.

On direct examination, plaintiff testified that defendant did not provide any special equipment to hold up these racks. However, it appears from plaintiff's testimony on cross-examination that there were chains and blocks available which could be used for that purpose. These chains and blocks were not used for lowering racks, but to hold them up when being repaired or whenever the car was put in use for general merchandise hauling. Plaintiff testified that he did not think about using a chain or block to hold up the rack at the time.

Plaintiff's witness William Smith testified that where a rack cannot be raised or lowered, and there is no visible defect, one should expect to find the trouble is in the gear box. The proper procedure under such circumstances is to tie up the rack and remove the gear housing to ascertain if there is any defect in the gears.

The defendant, by rule, required all racks to be elevated to the top of the car after unloading, and to be secured by the two safety hooks located at the center of the racks. Plaintiff testified that defendant's orders were to lower these racks to the floor when the cars came into defendant's yard for inspection or repair.

It is urged by appellant that the court erred in overruling its motion for a directed verdict at the close of the whole case, and in refusing to sustain its after-trial motion for judgment in accordance with said motion for a directed verdict. In support of this assignment appellant contends: (1) that the evidence fails to show any negligence of the defendant as the proximate cause of plaintiff's injuries; and (2) that the evidence shows that plaintiff's negligence was the sole cause of his injuries.

In passing on appellant's first contention, we will confine ourselves to the issues submitted in plaintiff's main instruction. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91; Schiermeier v. Kroger Grocery & Baking Co., Mo.App., 167 S.W.2d 967; Bach v. Diekroeger, Mo. App., 167 S.W.2d 934; Hammontree v. Edison Bros. Stores, Mo.App., 270 S.W.2d 117; Girratono v. Kansas City Public Service Co., Mo.App., 243 S.W.2d 539.

By plaintiff's main instruction the case was submitted to the jury on the theory of defendant's failure to exercise ordinary care to furnish plaintiff with a reasonably safe place to work. The facts hypothesized, authorizing a finding of negligence in this respect, were: (1) that the rack was likely to suddenly fall and injure plaintiff in the event of a defective gear, and that plaintiff was not properly instructed in respect to precautions to be taken to protect himself in such an event; and (2) that defendant failed to use reasonable care to adopt methods of work to protect workmen, including the plaintiff, from injury from a sudden fall of the rack; and (3) that plaintiff, in order to perform his work, was required to be in a place where he was in danger of being struck by the end of the rack and the U-shaped extension protruding from the end thereof.

The first charge of negligence submitted in plaintiff's instruction was that defendant negligently failed to instruct plaintiff with respect to precautions to be taken to protect himself in the event the rack should fall as a result of a defective gear.

The duty of warning and instructing servants is entirely distinct from and

independent of the duty of furnishing reasonably safe premises and appliances. Submission of facts authorizing the jury to find a breach of that duty has no place in an instruction authorizing a recovery for failure to furnish a reasonably safe place to work. Furthermore, it is doubtful whether the petition in this case was broad enough to cover the alleged negligent failure to warn and instruct, which was submitted in plaintiff's instruction. However, we will overlook this defect in the pleading, as well as the irregularity in the submission. We will treat the matter as a separate assignment of negligence properly pleaded, and pass upon the sufficiency of the evidence to support such a charge.

The evidence shows that the danger of the rack falling due to a defective gear was remote and its occurrence infrequent. Plaintiff testified that he had never before encountered a defect in a gear of the kind involved in the instant case. Plaintiff's witness William Smith testified that he had never seen a gear broken like the one in question. Smith was general car foreman for the defendant company, and had been in car maintenance and car repair work about forty years. He had had experience with the Evans auto loader as a foreman since 1942, and in a nonsupervisory capacity for some time prior to that. The only evidence of the occurrence of a similar defect was given by defendant's witness D. K. Scheffler, a welder employed by defendant, who testified that he had seen such a defect once in 1948 or 1949. There was thus no evidence that such gears were so inherently liable to break as to require defendant to take notice that in their use a hidden danger lurked which should have been communicated to employees.

■ The employer is not to be held responsible because it failed to foresee and give warning of remote, improbable and exceptional occurrences. His duty to warn is limited to such perils as reasonably are to be anticipated. 35 Am.Jur., Master and Servant, sec. 149, page 581; 56 C.J.S., Master and Servant, § 298, p. 1060; Brands v. St. Louis Car Co., 213 Mo. 698, 112 S.W. 511, 18 L.R.A.,N.S., 701; Hysell v. Swift

& Co., 78 Mo.App. 39; American Brewing Ass'n v. Talbot, 141 Mo. 674, 42 S.W. 679; Ford v. Tremont Lbr. Co., 123 La. 742, 49 So. 492, 22 L.R.A.,N.S., 917; Brewer's Adm'x v. Louisville & N. R. Co., 237 Ky. 71, 34 S.W.2d 949.

In Brands v. St. Louis Car Co., supra, it was held that a master was not negligent in failing to warn an employee of the danger of an explosion of an emery wheel at which he was set to work, where the danger of explosion was so slight as to relieve the defendant of the charge of negligence in furnishing such wheel.

The test to be applied is set out in a quotation in Hysell v. Swift & Co., supra, as follows, 78 Mo.App. loc. cit. 50:

" 'A reasonable man does not consult his imagination, but can be guided only by a reasonable estimate of probabilities. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what his reason and experience will enable him to forecast as probable, nor conduct on a basis of bare chances, a business whose success is dependent upon his accuracy in forecasting the future. He will order his precaution by the measure of what appears likely in the usual course of things.' Ray's Negligence of Imposed Duties, 133. Webb's Pollock on Torts, 45, says that, 'a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all.' "

■ In our judgment, defendant performed its full duty by warning and instructing plaintiff to take the precaution to stay clear of the rack at all times, and was not negligent in failing to give a special warning of the possibility of the rack falling due to a defective gear.

■ The second assignment of negligence submitted by plaintiff's instruction

was that defendant failed to use reasonable care to adopt methods of work to protect workmen, including plaintiff, from injury from a sudden fall of the rack. No safer method than the one customarily employed was suggested by the evidence. Available to plaintiff, according to his own testimony, were chains and blocks for use in holding up the rack so that an inspection and repair of the hoist mechanism could be made without encountering the danger of a falling rack. In our judgment, there was not sufficient evidence to warrant the submission of this assignment of negligence.

■ The third assignment submitted was that plaintiff was required to work in a place where he was in danger of being struck by the end of the rack and the U-shaped extension protruding from the end thereof. The evidence does not support this charge.

The rack in question is guided from the top of the car downward toward the floor by means of arms attached to the rack and the top of the car. When the rack is at the top of the car there is a clearance of 16 inches from the end of the rack to the end of the car. As the rack is lowered it swings to the center of the car, so that the space between the rack and the end of the car widens as the rack descends. Plaintiff testified that the ceiling of the car is between 8 to 9 feet, 3 inches, high. At the corners of the rack there is a brace-U which, according to plaintiff's testimony, extends out from the end of the rack from 4 to 10 inches. Plaintiff testified that when the rack was shoulder high the end of the rack was 24 to 26 inches from the end of the car, and the end of the brace-U was about 15 inches from the end of the car. Plaintiff also testified that the brace-U would clear him if he were standing up against the wall. That there was sufficient clearance between the end of the rack and the end of the car to clear one standing in such space is clear from the evidence. There was thus, according to plaintiff's evidence, sufficient space provided for plaintiff to carry on his work by lowering and inspecting the rack without danger of being struck. It was not the failure to provide a reasonably safe place to work which was the proximate cause of plaintiff's injuries.

After a careful examination of the record, we have discovered no evidence to support the charges of negligence submitted. For that reason, the judgment of the trial court is reversed.

RUDDY and MATTHES, JJ., concur.