**William H. KOMESHAK (Plaintiff) Appellant,**

**v.**

**MISSOURI PETROLEUM PRODUCTS COMPANY, a corporation (Defendant), Respondent.**

No. 29844.

St. Louis Court of Appeals.

Missouri.

June 14, 1958.

Morris E. Stokes, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for appellant.

Rene J. Lusser, Lusser & Morris, St. Louis, for respondent.

RUDDY, Presiding Judge.

This is an action for damages for personal injuries sustained by plaintiff. From a judgment in favor of defendant, plaintiff appeals.

Plaintiff in his petition alleged that the defendant through it agents and employees was engaged in work necessary to the resurfacing of a highway in the State of Illinois; that a part of said work consisted in filling cavities beneath the surface of said highway by pumping molten tar through drilled holes into said cavity, thereby filling said cavity and that thereafter the hole was plugged with a wooden stake or plug for the purpose of preventing the molten tar from escaping until such time as it hardened or set.

Plaintiff further alleged in said petition that he was an employee of Maclair Asphalt Company, Inc., and as such was re-

quired to remove said plugs and to clear away the excess tar around them; that when he removed a wooden stake or plug from one of said holes hot tar exploded and spewed forth from said hole striking and injuring him.

The petition charged defendant with negligence (a) in failing to warn plaintiff of the danger connected with removal of the plug; (b) in creating a dangerous condition by pumping hot tar into a moist pocket beneath the surface of the highway; and (c) in failing to instruct plaintiff to wait a sufficient length of time before removing the plug.

Defendant in its answer, among other things, alleged that at the time of plaintiff's injury he was a loaned employee of the defendant; that the defendant was the special employer of the plaintiff; and, by reason thereof plaintiff is barred from maintaining this action because he comes within the provisions of the Workmen's Compensation Law of the State of Illinois, S.H.A. ch. 48, § 138.1 et seq.

It is contended by plaintiff that the trial court erred in giving Instruction No. 5 at the request of defendant for the reason that it submitted a defense not supported by the evidence and for the further reason that said instruction failed to hypothesize facts essential to the defense submitted therein. This instruction submitted the defense that plaintiff was a loaned employee of defendant and was subject to the provisions of the Illinois Workmen's Compensation Act. We find it unnecessary to discuss the above mentioned points relied on by plaintiff because we must hold that plaintiff failed to make a case for the jury. Where plaintiff fails to make a case for the jury, alleged errors of the trial court are immaterial and deemed harmless. Cottonwood Fibre Co. v. Thompson, 359 Mo. 1062, 225 S.W.2d 702; Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240.

Plaintiff was employed by the Maclair Asphalt Company, Inc. His employer had a contract with the State of Illinois to re-surface part of Illinois Highway No. 768. The Maclair Asphalt Company, Inc., entered into a contract with the defendant whereby the defendant agreed to drill approximately 250 holes in the concrete pavement on said highway and to pump approximately 5,000 gallons of asphalt into said drilled holes for the purpose of undersealing certain portions of said highway. The undersealing of said highway in this manner was a prerequisite to the resurfacing thereof by the Maclair Asphalt Company, Inc. The portions of the highway where the holes were drilled and the asphalt was pumped in had been indicated by the Highway Department of the State of Illinois. The 250 holes were drilled and filled with asphalt pursuant to the contract on September 28, 1953. It was a one-day job and the evidence showed that on such jobs it was the practice of the defendant to supply the key men on the job such as the pumper and the tank operator. Prior to appearing on the job the defendant had made arrangements with the Maclair Asphalt Company, Inc., to supply some of its employees. Among the persons furnished by the Maclair Asphalt Company, Inc., were the plaintiff and his foreman, Mr. DePriest.

The method of undersealing the highway was described by the foreman and another employee of the defendant. The first operation is to drill a hole approximately two inches in diameter in the concrete highway by means of a drill operated by an air compressor. Thereafter, hot asphalt of approximately 400° Fahrenheit is pumped underneath the pavement through a hose with a nozzle attached. The nozzle is inserted in the drilled hole and asphalt is pumped into the cavity until it is filled. After the nozzle is removed the hole is plugged with a tapered stake about four feet in length. This stake is inserted immediately after the nozzle is withdrawn. Following the men who perform the aforesaid operations and after they are a certain distance ahead, is another crew of men who remove the stakes and clean off any excess asphalt that may remain on the top of the pavement.

The defendant company was considered a specialist in the job of undersealing highways. On the occasion of plaintiff's injury he was engaged in removing the stakes and cleaning the pavement.

The evidence showed that plaintiff had been employed by the Maclair Asphalt Company, Inc., for about three months prior to his injury. He had never worked for the defendant at any time, and prior to the day of his injury he had no experience in undersealing highways. He testified he had no experience from which he could know the danger of asphalt spewing or blowing out of the hole after the stake was removed. However, in this regard, he testified he withdrew the stake slowly and carefully. When he was asked why he withdrew the stake slowly and carefully, he answered, "Well, it is just human nature for one to watch out for himself on a job of that nature." In another part of his testimony he said he withdrew the stake carefully and "wiggled" it, because he "knew there was a danger of it blowing."

Plaintiff testified that his foreman, Mr. DePriest, worked for the Maclair Asphalt Company, Inc., on the day of plaintiff's injury and that he (plaintiff) had worked under him all of the day he was injured. When plaintiff was asked about the authority of Mr. DePriest, he said, "He was my foreman, and that is the only one I got my orders from." He further testified that the work he was doing at the time of his injury was done at and under the direction of Mr. DePriest. In this same connection it is undisputed in the evidence that Mr. DePriest was the only one who could instruct or give orders to plaintiff. Mr. DePriest was described by all of the witnesses as a "working foreman." All of the witnesses agreed that in the State of Illinois a laborer working on this job could only be instructed by the "working foreman." Mr. Busch, foreman for defendant, a witness offered by plaintiff, testified that he was not permitted to tell the "laborer working on the job what his job is, and what he is to do, and where to do it." He said any instruc-

tions he had for the plaintiff and other laborers on the job had to be given to Mr. DePriest and that he (Mr. DePriest) would convey the instructions to the laborers. The testimony indicated that the basis of this procedure, which had to be followed, was a Union rule in effect in the State of Illinois. It was admitted by plaintiff that only Mr. DePriest could give him instructions. When plaintiff was asked if Mr. DePriest, the working foreman, was the only one who could give him orders, he answered, "That is correct. Everything came through him."

Mr. Busch testified that he told Mr. DePriest "to keep the men back 10 or more pegs" behind the crew that was pumping the asphalt into the cavities. He further instructed Mr. DePriest that when the stake or peg was being removed "you should wiggle it and pull it slowly to see if there is any back pressure on the peg, and if there is you should put it back in the hole." He also testified he told Mr. DePriest if any bubbling of the asphalt is observed to put the stake back in the hole and to skip removing the stake from that hole and to go on to the next stake. In a deposition, this witness testified he instructed Mr. DePriest to keep the men at least eight holes back of the pumping crew. Mr. Busch further testified no one else, that he knew of, gave Mr. DePriest instructions.

Plaintiff testified that Mr. DePriest showed him how to do his work. He said he received no instructions from Mr. Busch or any other person connected with the defendant. He further testified that pursuant to instructions received from Mr. DePriest he worked "eight, nine or ten plugs behind" the pumping crew and withdrew the stakes from the holes slowly and carefully. He said he would "wiggle" the stake and then pull it up slowly. He further testified that he followed this procedure because of the cautionary instructions given him by Mr. DePriest. After the stake was removed the excess asphalt would be removed from the highway pavement. He said he knew you could not be too close

to the pumping crew "because it would be too hot," obviously meaning the asphalt would be too hot.

At the time plaintiff sustained his injury he said he was working about "eight, nine, maybe ten" stakes behind the pumping crew. When plaintiff was asked if he could estimate the time that had elapsed between the filling of the hole with the asphalt and the removal of the stake, he answered "Well, it could have been anywhere from 10 to 15 to 20 minutes." When plaintiff removed the stake from the hole at which he was injured, he said he wiggled the stake and pulled it up slowly and turned the stake "a little way from me in case it did blow." He said nothing happened to indicate there was pressure in the hole. After removing the stake he heard a hiss and it was at this time that the asphalt spewed out of the hole and struck his arm. Plaintiff further testified that he was working on a downgrade in the highway and that the hole at which he was injured was "about midway" on the downgrade. Plaintiff further testified that on no other occasion that day did asphalt blow out of the hole when the stake was removed, nor did he experience any pressure on the stakes when removed from other holes.

There was testimony by one of plaintiff's witnesses that sometimes there is moisture under the pavement and when the hot asphalt is pumped into the hole steam pressure against the stake is developed. The testimony showed that the most likely place for moisture to be found was at the bottom of a downgrade or hill. However the witnesses said there was no way of determining the condition of the earth under the highway pavement.

Mr. Busch, a witness for plaintiff, testified that he had been in the employ of the defendant for 11 years and on the day of plaintiff's injury was in charge of defendant's employees. The evidence showed that he had experience in every phase and operation of undersealing highways. He estimated the time lapse on the day in question between the pumping of the asphalt into the hole and the removal of the stake was 15 to 20 minutes. It was his opinion that the asphalt on the job in question would congeal under all conditions in 15 to 20 minutes. However, he did say in other parts of his testimony that the time varies and may depend upon the amount of asphalt pumped into a hole and the amount of moisture therein. He said on the day of the injury to plaintiff the crew in which plaintiff was working was 8 to 10 stakes behind the pumping crew. He testified that there were about 3 dozen stakes on the job. When he was asked if there was any reason why he could not have used all of the stakes and kept the men more than 8 to 10 stakes behind the pumping crew, he answered, " * * * the material being pumped in there was not safe for more stakes, because when you pull a plug out you would find the asphalt had congealed." We understand from this testimony that if the asphalt congeals or solidifies there would be difficulty in removing the stakes. Mr. Busch further testified that in all his experience he has seen asphalt blow out of a hole after the stake was removed on only two occasions. Never in his experience was a man injured on the job from this cause.

Mr. Kuhnert, a witness for plaintiff, testified he was an employee of the defendant on the day of plaintiff's injury. He was pumping the asphalt into cavities under the highway pavement. He had four years experience in undersealing highways. He did not know how far plaintiff was behind the pumping crew at the time of his injury. He had no opinion as to how long it would take the asphalt to congeal or solidify and said the amount of time would depend on how much asphalt had been pumped into the hole. He did think that not more than 50 gallons of asphalt had been pumped into any one hole on the day of plaintiff's injury.

He further testified that in his experience on a few occasions, asphalt blew out

of the hole immediately after pumping it into the cavity and sometimes the stakes were forced out immediately after inserting the asphalt. He said he knew of no instance when the asphalt blew out of the hole when the stake was removed, although he was aware that it was possible. He did say that on rare occasions when the holes were close to each other asphalt would spurt out of the hole. There was no testimony as to how close the holes were to each other on the day in question. Mr. Kuhnert said it was steam created by the moisture in the cavity that caused the pressure against the stake. He thought a safe distance for removal of the stakes was eight to ten stakes behind the pumping crew. In his experience he never saw anyone get hurt when they maintained that distance. The witness further stated that it was standard procedure in undersealing a highway for the crew removing the stakes "to stay at least 8 or 10 stakes behind" the pumping crew. He said this was a safe distance, but in addition the stakes should be removed slowly and if there was any bubbling of the asphalt the stake should be reinserted. He never saw anyone get hurt when these practices were observed.

In his pleadings and throughout the trial and in this court plaintiff has contended that he was an employee of Maclair Asphalt Company, Inc., and was not an employee of the defendant. The extent of defendant's duty to plaintiff must be measured on the assumption that plaintiff was not a servant of the defendant.

Plaintiff's principal instruction required the jury to find that he was employed by the Maclair Asphalt Company, Inc. This instruction also told the jury that the defendant owed the duty to plaintiff to exercise ordinary care in giving instructions affecting the work which plaintiff was doing and told the jury that defendant had the duty of giving the plaintiff a timely and sufficient warning of any danger connected with the doing of his work in the vicinity where defendant's operation was

being carried on. This instruction required the jury to find "that defendant instructed plaintiff's foreman to keep plaintiff eight or ten holes back from the place where said tar was being inserted, when defendant knew or should have known in the exercise of ordinary care that said distance was not sufficient to permit said tar to solidify under all conditions, and by reason thereof there was probable danger of said tar blowing out of the hole after removal of the stake or plug" and if they found that in the exercise of ordinary care defendant should have given instructions for plaintiff to remain a sufficient distance behind the point where the hot tar was being inserted to allow it to solidify under all conditions and failed to do so and found that this failure was negligence, it could find in favor of the plaintiff. Briefly, the theory of negligence submitted to the jury was the failure of defendant to instruct plaintiff to keep a sufficient distance behind the pumping crew and that defendant's failure to so instruct plaintiff could be the basis for a finding of negligence.

Plaintiff was not an employee of defendant and, therefore, the relationship of master and servant did not obtain. The evidence is uncontradicted that plaintiff was subject to the orders of his working foreman and no one else. His working foreman was an employee of the Maclair Asphalt Company, Inc. Defendant asserts that under these circumstances there was no duty cast upon the defendant to warn the plaintiff as to any precautions he should take or exercise in the performance of his work for his employer. Defendant cites the case of Karr v. Chicago, R. I. & P. R. Co., 341 Mo. 536, loc.cit. 546, 108 S.W.2d 44, loc.cit. 49, wherein the court held:

"It is not sufficient for complainant to show that he has been injured by the failure of another to perform a duty or obligation unless that duty or obligation was one owing to complainant. * * * Clear-

ly to be actionable negligence the injury complained of must result from the violation of a legal duty owed by defendant to the injured party."

In that case plaintiff was an employee of the defendant company and was injured when an automobile and one of defendant's passenger trains collided. The court held that plaintiff .did not make a case for the jury because the negligence, if any, of the defendant was not a violation of a duty owing to the plaintiff and, therefore, did not afford plaintiff a cause of action against defendant on the ground of the negligence alleged.

Defendant also asserts that plaintiff was a mere volunteer as to the defendant in which case defendant would not be liable for mere negligence and cites the case of Shaffer v. St. Louis & S. F. Ry. Co., 201 Mo.App. 107, 208 S.W. 145. The rules of law set out in the Shaffer case and in the Karr case are inapplicable to the facts of the instant case.

The facts in the case at bar show the defendant to be a subcontractor working under an agreement with a general contractor. In the case of Loehring v. Westlake Construction Co., 118 Mo.App. 163, loc.cit. 172, 94 S.W. 747, loc.cit. 750, the court said:

"It is now well settled in the law of negligence applicable to cases of this nature, that there are duties owing, the violation of which will constitute actionable negligence, in instances other than those arising out of privity of contract, and many such arising outside of the relation of master and servant etc. The principle finds application in that class of cases where the injured party is rightfully on the premises, and is injured by the negligence of another under such circumstances as could reasonably have been foreseen, been contemplated, and the probable injury averted by ordinary care on the part of the person whose act caused the injury.

From an examination of the adjudicated cases, the general rule deduced therefrom seems to be; whenever circumstances attending the situation are such that an ordinarily prudent person could reasonably apprehend that as the natural and probable consequences of his act, another person, rightfully there, will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises, and if such care is not exercised by the party on whom the duty rests and injury to another person results therefrom, liability on the part of the negligent party to the person injured will generally exist, in the absence of any other controlling element or fact, and this too, without regard to the legal relationship of the parties."

The facts in the aforementioned case show that the plaintiff was in the employ of the Roebling Construction Company and charged negligence on the part of another contractor, Westlake Construction Company.

A contractor is liable for his or his servant's negligence in causing injury to the servant of another contractor engaged in work on the same premises. Liddle v. Collins Construction Co., Mo., 283 S.W.2d 474. To the same effect, see Kiehling v. Humes-Deal Co., Mo.App., 16 S.W.2d 637, and Miller v. Brunson Const. Co., Mo., 250 S.W.2d 958. The gist of the aforesaid principle of law, so far as it is applicable to the instant case, is that if the defendant could reasonably have foreseen and contemplated the act which caused the injury to plaintiff, then defendant may be found negligent.

We think the trial court in the instant case properly instructed the jury that defendant had the duty to give plaintiff timely and sufficient warning of any danger connected with plaintiff's work in the vicinity of or in connection with defend-

ant's operations, when defendant knew or should have known of the dangers involved.

It is admitted by plaintiff that the working foreman, Mr. DePriest, was the only person who could give him instructions. It is also admitted by plaintiff in his testimony that he was instructed by Mr. DePriest to stay behind the pumping crew 8, 9 or 10 stakes and to withdraw the stakes from the holes slowly and carefully. Plaintiff was further instructed to "wiggle" the stake when withdrawing it. It is also shown in plaintiff's case that Mr. Busch, foreman for the defendant, instructed Mr. DePriest to keep the men who were removing the stakes back 10 or more pegs behind the pumping crew and to wiggle the stake and pull it out slowly to see if there was any back pressure on the stake and if there should be, to put it back in the hole. Plaintiff's own case shows that these instructions were given to Mr. DePriest and, in turn, Mr. DePriest conveyed these instructions to the plaintiff. Plaintiff's testimony shows that at the time he was injured, he was about "8, 9, maybe 10" stakes behind the pumping crew.

■ In considering whether or not plaintiff made a submissible case for the jury, it is not enough for plaintiff's evidence to show that there has been damage to the person of plaintiff, nor is the standard of diligence to be measured in retrospect. Rather it must be the risk reasonably to be apprehended before the actual injury takes place.

Plaintiff contends that defendant could have reasonably foreseen and anticipated the danger and the injury that resulted. This contention of defendant when applied to the evidence in this case means that defendant could have reasonably foreseen the probability of asphalt spewing from the cavities when the stakes were removed at a distance of 8 to 10 stakes behind the pumping crew.

As we said before the rule applicable here must be considered not in the light of what happened, but with reference to that which ordinary prudence should have anticipated as likely to happen. What a person of ordinary prudence under the circumstances would have done is the legal test and not the exercise of hindsight or wisdom that is revealed after the event occurs. Fundamentally, the duty of a person to use care and his liability for negligence depend upon the tendency of his acts under the circumstances as they are known or should be known to him. The foundation of liability for negligence is knowledge,—or what is deemed in law to be the same thing; opportunity by the exercise of reasonable diligence to acquire knowledge —of the peril which subsequently results in injury. 38 Am.Jur., Negligence, Sec. 23, p. 665.

■ In order to charge one with knowledge of the dangerous character of an act, the danger from said act must be such as is recognized by common experience or in the instant case by the experience of persons engaged in similar work. Stated in another way, it is the natural and probable consequences which human foresight could anticipate because they happen so frequently that they may be expected to happen again. 38 Am.Jur., Negligence, Sec. 61, p. 712. No one is required to guard against or to take measures to avert that which under the circumstances is not likely to happen. Davis v. Springfield Hospital, 204 Mo.App. 626, 218 S.W. 696.

■ Returning to the facts in this case and applying the aforesaid principles of law we find that it was the duty of plaintiff to prove that the defendant through its agents and servants was under a duty to foresee and anticipate the danger of plaintiff being struck from spewing asphalt when he maintained a distance of eight to ten stakes behind the pumping crew. The evidence in this case does not reveal any reason for defendant's foreman and other employees to anticipate that asphalt would spew out of the hole when the stake was removed when a distance of eight to ten

stakes behind the pumping crew was maintained.

█ Defendant's duty to warn plaintiff extended only to such dangers as defendant could reasonably anticipate. Defendant was not liable if there was a mere possibility of peril, there must be a probability of its occurrence. In the case of Fowler v. Gulf, Mobile & Ohio Railroad Co., Mo., 286 S.W.2d 404, loc. cit. 409, we said:

"The test to be applied is set out in a quotation in Hysell v. Swift & Co., supra, as follows, 78 Mo.App. [39], loc. cit. 50:

" 'A reasonable man does not consult his imagination, but can be guided only by a reasonable estimate of probabilities. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what his reason and experience will enable him to forecast as probable, nor conduct on a basis of bare chances, a business whose success is dependent upon his accuracy in forecasting the fututre. He will order his precaution by the measure of what appears likely in the usual course of things.' Ray's Negligence of Imposed Duties, 133. Webb's Pollock on Torts, 45, says that, 'a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all.' "

From this we see that it is the duty of defendant to anticipate danger and to measure its duty by what appears likely in the usual course of things. The evidence in this case shows that in the course of undersealing highways, usually there is no spewing of asphalt from the holes when the stakes are removed, if the person removing the stake stays behind the pumping crew

eight to ten stakes. The evidence shows that Mr. Busch and Mr. Kuhnert had long experience in the work of undersealing highways. Mr. Busch testified that in his long experience he has seen asphalt blow out of the hole after the stake was removed on only two occasions and never in his experience was a man injured from this cause. Mr. Kuhnert testified that in his experience he knew of no instance when the asphalt spewed out of the hole when the stake was removed after maintaining a distance of 8 to 10 stakes behind the pumping crew although he was aware it was possible. This witness further stated that it was standard procedure in undersealing a highway for the crew removing the stakes to stay 8 to 10 stakes behind the pumping crew. He considered this a safe distance. It will be remembered that Busch and Kuhnert were witnesses for plaintiff. No other witnesses with experience testified in the case.

The negligence of the defendant in this case must be predicated on what ordinarily occurs when engaged in the job of undersealing highways and not on what may happen on rare occasions. In other words, the occurrence to be anticipated must be within the range of probabilities and not possibilities. Loehring v. Westlake Const. Co., supra; Davis v. Springfield Hospital, supra; Emrick v. City of Springfield, Mo. App., 110 S.W.2d 840.

█ The defendant in the instant case was not required to anticipate a mere possibility. The evidence in this case shows the occurrence that injured plaintiff happens on rare occasions and was not a usual and ordinary happening where the indicated distance is maintained. We cannot say there is sufficient evidence from which a jury could find that defendant could have reasonably foreseen the likelihood of the occurrence that injured plaintiff. The jury cannot draw on their own experiences because the occurrence involved is one that does not come within the ordinary experience

of persons. The jury must have evidence from persons experienced in the work of undersealing highways to the effect that the instructions given plaintiff were insufficient and that persons engaged in such work could reasonably anticipate the occurrence in question. No such evidence was adduced. To the contrary, there was evidence that the practice followed was standard procedure in connection with the undersealing of highways and the removal of stakes in connection therewith. The test of negligence under the circumstances was whether or not defendant observed the custom and practice of those engaged in a similar business. There was no proof that defendant failed to do so. No jury can be permitted to say that the usual and standard procedure followed by those in the same business is a failure to exercise care for which liability shall be imposed. Brands v. St. Louis Car Co., 213 Mo. 698, loc. cit. 708, 112 S.W. 511, loc. cit. 514; 18 L.R.A.,N.S., 701; 38 Am.Jur., Negligence, § 34, p. 682.

It is our judgment that the evidence in this case shows that defendant exercised the care exercised by others in the same kind of business on the giving of instructions to plaintiff's foreman as to the manner in which the stakes should be removed. There was no evidence from which the jury could find that the instructions given were insufficient and there was no evidence from which the jury could find that defendant could have reasonably anticipated the occurrence which injured plaintiff.

In our opinion there was no case for the jury. The judgment should be affirmed. It is so ordered.

ANDERSON, J., concurs.

MATTHES, J., sat in this case but is no longer member of this court.