# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2897
_____

Teddy Scott; Melanie Scott

*Plaintiffs - Appellants*

v.

Dyno Nobel, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 25, 2019
Filed: July 24, 2020
[Published]

_____

Before LOKEN, COLLOTON, and KOBES, Circuit Judges.

_____

PER CURIAM.

Teddy and Melanie Scott commenced this diversity action alleging that a nitric acid manufacturing plant operated by Dyno Nobel, Inc. ("Dyno"), negligently emitted a cloud of nitric oxides that engulfed Teddy Scott and several others working at the Calumet Plant ("Calumet"), a neighboring facility in Louisiana, Missouri, causing Scott severe respiratory injuries. After substantial discovery, the district court,

applying Missouri law, granted Dyno summary judgment, concluding Dyno did not owe Scott a legal duty of care because his injury was not foreseeable. The Scotts appeal and Dyno cross appeals, raising various issues. We conclude the summary judgment record establishes that the question of foreseeability, as incorporated into the analysis of the legal duty of care under Missouri law, was not appropriate for summary judgment. Accordingly, we reverse and remand for further proceedings, declining to resolve other issues at this interlocutory stage.

**I.**

Dyno's nitric acid plant converts ammonia into nitrogen oxide and nitrogen dioxide (collectively "NOx"). Water combines with NOx under high pressure in an "absorber" to create nitric acid. In conformity with its air permit, Dyno discharges unconverted NOx gas into the atmosphere through a 108-foot exhaust stack. Periodically, Dyno shuts down the nitric acid plant to perform maintenance. During "startup" to resume nitric acid production, the plant emits more NOx gas than normal as the absorber is gradually ramped up to peak efficiency. At higher concentrations, NOx gas is dark yellow, red, or brown and is denser than air.

NOx is toxic, particularly nitrogen dioxide. When inhaled, NOx can cause numerous respiratory problems. Nitrogen oxide and nitrogen dioxide are listed as "Section 302 Extremely Hazardous Substances" in quantities above their "Threshold Planning Quantity" in the U.S. Environmental Protection Agency's Consolidated List of Chemicals subject to various federal environmental statutes. See 40 C.F.R. Pt. 355, Apps. A, B (2008). During discovery, a Dyno employee testified that documents kept in Dyno's control room included chemical safety cards for nitrogen oxide and nitrogen dioxide. The summary judgment record includes a chemical safety card for nitrogen dioxide published by the National Institute for Occupational Safety and Health showing the skull and crossbones symbol for "acute toxicity," listing adverse

health conditions that occur if the gas is inhaled, and warning that, if not contained, "a harmful concentration of this gas in the air will be reached very quickly."

As one would expect, Dyno takes numerous precautions to prevent its emissions of NOx gas from coming in contact with persons on or near its plant facility. First and foremost is the 108-foot exhaust stack. As Dyno explained in its Response Brief, the "emissions stack is 108 feet high so that . . . stack emissions do not endanger those working on the ground, either near the stack or at a neighboring property like Calumet." Only the plant's 200-foot "prill tower" is taller than the exhaust stack, and during post-maintenance startups, Dyno does not allow people in the prill tower because startup emissions pose risks to persons located above the exhaust stack. Dyno also conducts startups in the early morning hours when persons are unlikely to be visiting or working at neighboring facilities, monitors the wind direction during startup in the event evacuation is necessary, and avoids starting up if the wind is blowing towards Calumet. Dyno's "Emergency Control and Crisis Communication Plan" includes emergency procedures and first-aid responses in the event of a NOx release. Dyno has a presentation titled "NOx Awareness," explaining what to do in the event of NOx exposure and referring Dyno employees to its "Information for Treating Doctor" document.

On March 20, 2015, Dyno began a startup at 3:30 a.m. following completion of routine maintenance. At approximately 5:30 a.m., an equipment failure shut the plant down again. After repairs, Dyno reinitiated the startup process sometime after 8:00 a.m., during working hours at Calumet. The Scotts allege that the weather was cloudy and hazy with low, swirling winds. At approximately 8:13 a.m., Scott and his co-workers observed a dark cloud emerge from Dyno's exhaust stack and settle on top of trees to the east of Calumet rather than rising into the atmosphere. A sudden gust of wind swept the cloud into Calumet, enveloping workers that included Teddy Scott. There are many disputed facts regarding this incident, but Dyno does not

dispute for purposes of this appeal that its startup emissions traveled from the exhaust stack to Calumet and hit Scott and his co-workers.

After substantial discovery, Dyno moved for summary judgment on multiple grounds.  On the question of legal duty we consider on appeal, Dyno argued:

> although Mr. Scott may be able to argue that it was *possible* that someone would be injured the way in which he claims he was injured, he cannot successfully establish that such an injury was *probable*.  The Louisiana plant has operated since the 1950's. . . . In all of those years, no one has ever been injured by, or claimed to have had any health issues arising out of, emissions from a startup until this case.  Certainly, no one has ever seen or heard allegations of a plume behaving in the manner described in this case.  Thus, there is simply no evidence from which a jury might conclude that Dyno could have reasonably foreseen or anticipated the likelihood of an injury of the type claimed by Mr. Scott, and Mr. Scott's negligence claim should therefore be dismissed.

Though this argument was framed in terms of what a reasonable jury might find, the district court accepted the argument as establishing that Dyno owed Teddy Scott no duty of care, a question of law:

> [Dyno] did not owe a duty to [Scott].  In many years of operations, [Dyno] never received reports of an undispersed, ground level cloud of smokestack emissions, or of injuries from smokestack emissions.  Even if it was perhaps always a possibility that emissions could behave atypically and injure someone on the ground, nothing shows that the probability of that risk would have risen to a foreseeable level.

In reviewing the grant of summary judgment, we of course view the facts in the light most favorable to the Scotts, the non-moving parties.  Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1110 (8th Cir. 2005).

## II.

To succeed on a claim of negligence under Missouri law, a plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's injury. Wieland v. Owner-Operator Servs., Inc., 540 S.W.3d 845, 848 (Mo. 2018). Whether a duty of care exists is a question of law; whether a defendant owed a duty to a particular plaintiff depends in part on whether the risk in question was foreseeable. Lopez v. Three Rivers Elec. Co-op., Inc., 26 S.W.3d 151, 156 (Mo. 2000). "Foreseeability for purposes of establishing whether a defendant's conduct created a duty to a plaintiff depends on whether the defendant should have foreseen a risk in a given set of circumstances." Id. "In determining foreseeability for the purpose of defining duty, it is immaterial that the *precise* manner in which the injury occurred was neither foreseen nor foreseeable." Pierce v. Platte-Clay Elec. Coop. Inc., 769 S.W.2d 769, 776 (Mo. 1989)

The summary judgment record contains overwhelming evidence that Dyno had actual knowledge "that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid" discharging unconverted NOx gas where persons would inhale it. Id. But a risk is not foreseeable if it is outside "the orbit of the danger as disclosed to the eye of reasonable vigilance." Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo. 1990) (quotation omitted). Thus, in this case, foreseeability turns on Dyno's conduct in emitting NOx gas from a 108-foot smokestack above the Calumet worksite on the day in question.

The district court concluded that Scott's injury was not foreseeable because "no injuries related to smokestack emissions were reported in decades of operations at Dyno," and there was "no indication that Defendants believed that there was any meaningful probability that smokestack emissions would travel undispersed at ground level." In reviewing this conclusion, there is an important threshold question: Who

decides whether a risk of injury was foreseeable in a negligence action, the judge or a jury? The district court treated foreseeability as a question of law and decided the issue on summary judgment. As others have noted, however, that approach places a court "in the peculiar position . . . of deciding questions, as a matter of law, that are uniquely rooted in the facts and circumstances of a particular case and in the reasonability of the defendant's response to those facts and circumstances." A.W. v. Lancaster Cty. Sch. Dist. 0001, 784 N.W.2d 907, 914 (Neb. 2010).

One response to this "peculiarity" has been to remove the issue of foreseeability from the analysis of duty and to consider it instead under the rubric of breach. The Restatement (Third) of Torts takes this approach: "A lack of foreseeable risk in a specific case may be a basis for a no-breach determination, but such a ruling is not a no-duty determination. Rather, it is a determination that no reasonable person could find that the defendant has breached the duty of reasonable care." Restatement (Third) of Torts: Phys. & Emot. Harm § 7 cmt. j (Am. Law. Inst. 2010). On this view, duty does not turn on the fact-intensive question of foreseeability; instead, a "no-duty ruling represents a determination, a purely legal question, that no liability should be imposed on actors in a category of cases." Id.; see A.W., 784 N.W.2d at 915; Thompson v. Kaczinski, 774 N.W.2d 829, 834-35 (Iowa 2009); see generally W. Jonathan Cardi, Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts, 58 Vand. L. Rev. 739 (2005).

The Supreme Court of Missouri has not addressed the Third Restatement. Its recent decisions still incorporate foreseeability into the analysis of duty, but not always as an issue of law. In Pierce, the Court declared that "foreseeability for the purpose of defining duty" was an issue for a jury and concluded that "*[t]he jury was capable of weighing the evidence and determining* that appellant *could have foreseen the likelihood* that farm machinery would be operated in the vicinity of the unmarked guy wire, that the operator of the machinery would fail to see the wire and run into it, and that the result would be to break the supportive pole allowing the attached

cable to drop across the highway." 769 S.W.3d at 776 (emphasis added). In Lopez, the Court explained that Pierce "should not be read to support the proposition that determining whether a duty exists is for the jury," but allowed that "[i]n some cases, the jury may be charged with determining whether facts exist that may give rise to a finding of foreseeability, and, in turn, duty." 26 S.W.3d at 156 n.1. In other words, as we understand this footnote, if duty turns on foreseeability, and varying inferences are possible, the issue is one for a jury.[1] This understanding is consistent with Alcorn v. Union Pacific R.R. Co., where the Court explained that "[f]or purposes of duty, *and to determine whether Alcorn made a submissible case*, the question is whether Union Pacific should have foreseen the risk of danger and whether motorists driving south on County Road 501 were within the class of persons to whom such harm might foreseeably occur." 50 S.W.3d 226, 238 (Mo. 2001) (emphasis added). Likewise, in Street v. Harris, the Missouri Court of Appeals rejected defendant's motion for summary judgment based on the asserted lack of foreseeability because "whether facts exist that may in turn give rise to a finding of foreseeability is a question for the factfinder." 505 S.W.3d 414, 417 (Mo. App. 2016) (abrogated on other grounds).

Professor Cardi notes that even among jurisdictions that consider foreseeability in determining duty, some provide that foreseeability is to be decided by a jury. See W. Jonathan Cardi, The Hidden Legacy of Palsgraf: Modern Duty Law in Microcosm, 91 B.U. L. Rev. 1873, 1900-1913 (2011). In California, for example, duty of care is a question of law for the court, and foreseeability is a factor in determining duty, but foreseeability is a question of fact for the jury. Clarke v. Hoek, 174 Cal. App. 3d 208, 214 (Cal. App. 1985). This approach is consistent with Judge Cardozo's famous opinion in Palsgraf v. Long Island R.R. Co. that "[t]he risk reasonably to be perceived defines the duty to be obeyed . . . . The range of reasonable apprehension is at times

---

[1]Policy considerations may also call for a no-duty determination. See Hoffman v. Union Elec. Co., 176 S.W.3d 706, 708 (Mo. 2005); Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc., 700 S.W.2d 426, 432 (Mo. 1985).

a question for the court, and at times, *if varying inferences are possible, a question for the jury*." 162 N.E. 99, 100-01 (N.Y. 1928) (emphasis added).  Professor Cardi, citing the footnote in Lopez, 26 S.W.3d at 156 n.1, characterizes Missouri as a jurisdiction that reserves a determination of foreseeability for the court.  91 B.U. L. Rev. at 1901 & n.86.  We conclude, however, from our close reading of Missouri cases, including the Lopez footnote, that Missouri follows an approach that deems foreseeability a question for the jury, at least when varying inferences are possible.  However, as with the issue of proximate cause, which is normally for the jury, where the evidence supports only one reasonable finding on foreseeability, the issue becomes one that the court may determine on summary judgment.[2]

In the district court and on appeal, Dyno relied heavily on Komeshak v. Missouri Petroleum Products Co., where the Missouri Court of Appeals declared that "[d]efendant's duty to warn plaintiff extended only to such dangers as defendant could reasonably anticipate." 314 S.W.2d 263, 271 (Mo. App. 1958).  But Komeshak is not controlling Missouri precedent.  Moreover, we conclude it is consistent with our interpretation of later Supreme Court of Missouri decisions such as Lopez because the court in affirming a jury verdict for defendant held that the trial court "properly instructed the jury" that defendant had some duty to warn, and that there was not "sufficient evidence from which a jury could find that defendant could have reasonably foreseen the likelihood of the occurrence that injured plaintiff."  Id. at 269-71.  Komeshak's statement that for a danger to be foreseeable, there "must be a probability of its occurrence," id. at 271, has been superseded by later guidance from the Missouri Supreme Court: "[t]he test is not the balance of probabilities, but of the

---

[2]Proximate cause requires a Missouri plaintiff to show that injury was "the natural and probable consequence of the defendant's negligence." Stanley v. City of Independence, 995 S.W.2d 485, 488 (Mo. 1999).  The foreseeability component of proximate cause "refers to whether a defendant could have anticipated a particular chain of events that resulted in injury." Lopez, 26 S.W.3d at 156; see Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852, 865 (Mo. 1993).

existence of some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it." Lopez, 26 S.W.3d at 156 (quotation omitted).

On the summary judgment record in this case, we conclude the question of foreseeability is subject to varying inferences and is therefore an issue for a jury. Although there was no evidence that emissions of NOx gas from the Dyno smokestack previously had caused injury to workers at the nearby Calumet site, a reasonable jury could find that the circumstances of the emissions in this case created "some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." Lopez, 26 S.W.3d at 156.

First, it is undisputed that NOx emissions are denser than air. While Dyno's expert opined that NOx emissions rise from the smokestack because the stack heats them to 150 degrees Fahrenheit, there is evidence that the stack temperature at the time of the emissions at issue was only 75 to 105 degrees. There is also evidence that Dyno's unsuccessful startup on the day in question, its failure to purge excess NOx from the system before restarting, and the "stagnant" weather conditions that were present could have created higher concentrations, making it more likely that the denser NOx gas would sink upon expulsion from the exhaust stack.

Second, there is evidence that the weather conditions alone could have created some probability the NOx emissions would sink below normal air and endanger persons at the Calumet work site. There is evidence the wind was blowing in that direction at the time of the startup, and some witnesses observed low-hanging cloud cover and foggy conditions that morning. Dyno argued its 2018 air modeling study showed that a plume of emissions would have dispersed to non-dangerous levels by the time it reached Calumet. But Dyno's plant manager acknowledged that cloud cover could prevent the NOx emissions from rising.

Third, the parties disagree whether Dyno adequately notified Calumet prior to the startup in question. The Scotts allege that Dyno failed to notify Calumet of the risks of the startup emissions and then failed to continuously monitor those emissions. Dyno counters that it satisfied any obligation to warn by telling Calumet it would be deprived of steam while Dyno started up.

It is not our task to weigh these disputed fact contentions, and our brief description of the factually complex summary judgment record should not be taken as an attempt to do so. We only conclude that a reasonable jury could find that the combination of circumstances created some probability of harm to Calumet workers sufficiently serious that ordinary persons would take precautions against it. See Lopez, 26 S.W.3d at 156. Therefore, the question of foreseeability, as incorporated into the analysis of duty, was not appropriate for summary judgment.

## III.

The Scotts argue the district court erred by not imposing discovery sanctions and by failing to compel Dyno to produce a witness for a Fed. R. Civ. P. 30(b)(6) deposition. In granting summary judgment, the district court denied these discovery motions as moot. Dyno argues that we should affirm the grant of summary judgment on the alternative grounds that no admissible expert opinion established the relevant standard of care or that the NOx plume caused Teddy Scott's injuries. As the case must be remanded, we decline to rule on interlocutory discovery issues at this time, and we decline to decide in the first instance Dyno's alternative contentions regarding the merits of the Scotts' claims.

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

KOBES, Circuit Judge, dissenting.

I agree with the majority that the question in this case is "[w]ho decides whether a risk of injury was foreseeable [for purposes of establishing duty] in a negligence action, the judge or a jury?" Maj. Op. 5–6. But I believe the Missouri Supreme Court already provided its answer: "[I]t is for the court to determine as a matter of law whether the facts give rise to a duty." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 n.1 (Mo. banc 2000).

No Missouri decision has ever embraced the "varying inferences" rule. Both the Missouri Supreme Court and this court have consistently held that "'[w]hether a duty exists is purely a question of law,'" and the scope of that duty is also "for the court to resolve." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 654 (Mo. banc 2019) (quoting *Lopez*, 26 S.W.3d at 155); *see also Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 199 (Mo. banc 2014); *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1127 (8th Cir. 2019) (per curiam); *Aragon v. Wal-Mart Stores E., LP*, 735 F.3d 807, 809 (8th Cir. 2013).

The majority may have described the better rule. Perhaps Missouri's approach to foreseeability and duty is "peculiar." Maj. Op. 6. But "[t]he 'proper function' of a federal court sitting in diversity 'is to ascertain what the state law is, not what it ought to be.'" *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 625 (8th Cir. 2003) (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)).

I respectfully dissent.

_____

-11-